**Clarence E. JORDAN, Plaintiff,**

v.

**SANDWELL, INC., et alia, Defendants.**

**Westvaco Corporation, Plaintiff,**

v.

**Sandwell, Inc., et alia, Defendants.**

**Nos. 7:99CV00713, 7:99CV00724.**

United States District Court,
W.D. Virginia,
at Roanoke.

Jan. 31, 2002.

William Thomas Wilson, Russell Wayne Updike, Nolan R. Nicely, Jr., Wilson, Updike & Nicely, Covington, VA, for Clarence E. Jordan.

James Wilson Jennings, Jr., Elizabeth L. Niles, Woods, Rogers & Hazlegrove, PLC, Roanoke, VA, for Westvaco Corp.

Stephan Forrest Andrews, James W. Walker, James D. Hobbs, Jr., Paul David Anders, Wright, Robinson, Osthimer & Tatum, Richmond, VA, Paul C. Kuhnel, Wooten & Hart, Roanoke, VA, Robert Francis Redmond, Jr., LeClair Ryan, A Profes-

sional Corp., Richmond, VA, for Defendants.

## MEMORANDUM OPINION

TURK, District Judge.

These two cases, which involve a plaintiff allegedly injured when superheated water erupted from a tower at a paper mill and scorched his back, were consolidated for pretrial proceedings. The two defendants, Sandwell Engineering, Inc. ("Sandwell") and U.S. Filter Corporation ("U.S. Filter")[1] have moved for summary judgment against the two plaintiffs, Clarence Jordan and Westvaco Corporation ("Westvaco"). After carefully considering the parties' filings (which were voluminous, to put it mildly) and oral arguments, the Court rules on the motions *seriatim* as is outlined below.

## I. BACKGROUND

Plaintiff Jordan was an employee of Manpower, Inc., engaged in work on the site of Plaintiff Westvaco's Covington paper mill. The paper mill itself is a large and technically complex factory with varied pieces of equipment. One by-product of the paper making process is contaminated water, to which the parties refer as "foul condensate." In essence, the mill cleanses the foul condensate by boiling it; the water, transformed into gas, floats upward purified while the contaminants, still solid, fall downwards and otherwise find their way to disposal. The structure in which this takes place is a tower-like edifice called a "stripper." The newly cleansed water leaves the stripper and ends up in a "standpipe," which is open at the top.

Before the water is boiled in the stripper, it is heated up to near-boiling in a unit called the "heat exchanger." The hot water exiting the stripper also flows into the heat exchanger, where it transfers its heat to the water entering the stripper and supplies the thermal energy needed for the warming-up process. Thus, the heat exchanger serves both to cool down water exiting the stripper at boiling temperatures and heat up water entering the stripper to near-boiling temperatures.

On the day on which Mr. Jordan suffered his injury, some sort of malfunction in the system occurred and water ceased flowing into the stripper. The water leaving the stripper flowed into the heat exchanger but because there was no longer water flowing into the stripper, there was no impure, incoming water with which the already superheated water could exchange heat and it retained its high temperature. When the superheated water reached the standpipe, which had much cooler contents, the result was a "geyser." Boiling water spewed out of the standpipe and onto Mr. Jordan, burning him severely.

After mediation, Mr. Jordan settled the claims he had against Westvaco for one million dollars. He then filed a complaint against Sandwell and U.S. Filter, alleging design malpractice. Both defendants had participated in the design and construction of the improvements to the paper mill in the early 90's. Each had also had some involvement with the mill as late as 1995. Westvaco also filed a separate suit against both defendants, alleging that the defendants were contractually obligated to indemnify Westvaco for all or some portion of the million dollars it had paid to Mr. Jordan.

Both defendants have now moved for summary judgment on the claims against them.

---

1. 'U.S. Filter Corporation' is that defendant's business name; the official corporate name is 'U.S. Filter Wastewater Group, Inc.'

## II. SANDWELL'S MOTION FOR SUMMARY JUDGMENT AGAINST JORDAN

The standards under which this Court must consider a summary judgment motion are well-established. Upon a motion for summary judgment, the Court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 236–37 (4th Cir.1995). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The parties agree that Virginia law governs this diversity-of-citizenship action. Sandwell's basis for its motion is the Virginia statute of repose, Va.Code. § 8.01–250 (Michie Supp.2001). That statute provides that

> no action to recover for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective or unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction, or construction of such improvement to real property more than five years after the performance or furnishing of such services and construction.
>
> The limitation prescribed in this section shall not apply to the manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property . . .

Sandwell maintains that the services that it performed for Westvaco, which allegedly caused Mr. Jordan's injuries, were performed from 1989–91. Mr. Jordan filed his complaint in 1999. According to Sandwell, the complaint is untimely under the statute of repose, which under Sandwell's theory would extinguish any actions filed against it after 1996.[2] Mr. Jordan replies that Sandwell engaged in other, later activities at the Sandwell site which reset the repose period and render his action timely.

The language of the statute bars actions (1) for personal injuries (2) against a designer, planner, surveyor, or constructor (3) of an improvement to real property (4) who is not a manufacturer or supplier of equipment or machinery (5) when those actions are filed more than five years after the defendant furnished the services in question. The parties dispute each of

2. In this sense, a statute of repose is different than a statute of limitations. A statute of limitations extinguishes a cause of action when the plaintiff does not file his complaint within a certain amount of time after the action arises. For instance, in Virginia a personal injury plaintiff must generally file his action within two years after the time at which he is injured. *See* Va.Code § 8.01–243 (Michie 2000). A statute of repose (like § 8.01–250), in contrast, extinguishes actions against certain defendants not filed within a given time period after the defendant's last involvement with the events giving rise to the injury. For the purposes of a statute of repose, it is irrelevant when the injury accrues; the relevant point in time is when the defendant last interacted with the item or events allegedly causing harm. *See Cooper Indus. v. Melendez*, 260 Va. 578, 537 S.E.2d 580, 588 n. 9 (2000).

these aspects with varying degrees of vigor. The Court will therefore address each in turn.

### A. A Claim for Personal Injuries

■ The statute of repose applies, by its own terms, to actions for "personal injuries." Mr. Jordan claims that the statute should not apply because although he has filed claims for negligence, he also asserts a claim for breach of warranty. Under his theory, Sandwell warranted that it had safely constructed the Westvaco mill, when in fact it had not done so. The warranty counts of his action sound in contract, not tort, and therefore fall outside § 8.01–250.

The Court finds this argument to be without merit. Mr. Jordan obviously claims compensation in tort for injury to his person. This Court is aware of no Virginia law directly construing this aspect of the statute of repose. However, this situation is conceptually similar to *Friedman v. Peoples Service Drug Stores, Inc.*, 208 Va. 700, 160 S.E.2d 563 (1968). There the plaintiff tried to avoid the personal injury statute of limitations (two years under § 8.01–243) by pleading his claims as breaches of warranty, which have a longer limitations period under § 8.01–246. The Virginia Supreme Court rejected the plaintiff's efforts: "[T]he object of an action and not its form determines which statute of limitations is applicable."[3] Likewise it seems logical that the object of an action and not its form should determine whether the statute of repose is applicable. Because this is an action "to recover for . . . bodily injury," *see* § 8.01–250, the statute of repose can apply regardless of whether the complaint sounds in tort or contract.

In addition, the Court's holding harmonizes with that of the Massachusetts Supreme Court in *McDonough v. Marr Scaffolding Co.*, 412 Mass. 636, 591 N.E.2d 1079, 1083 (1992) (plaintiff cannot "nullify" statute of repose by recasting negligence claim as breach of warranty claim).

Jordan's claim against Sandwell meets the first element of the § 8.01–250 test.

### B. Against a Designer, Contractor, Surveyor, or Constructor

■ By its terms, the statute protects "any person performing or furnishing the design, planning, supervision of construction, or construction" of the improvements that the statute covers. Sandwell submits that the services it provided fall under the statute. In opposition, Mr. Jordan urges that the statute does not apply to Sandwell because the services that Sandwell provided "were much broader than the limited services . . . to which § 8.01–250 applies." *See* Plaintiff's brief at 8, 22.

The Court finds that Sandwell has the better of this argument. Although he cites very little to depositions or affidavits, Mr. Jordan complains in his brief that Sandwell was responsible for "layout" and "coordination" of the projects, which sounds to the Court like "design" and "supervision of construction."[4] *Id.* at 22. Sandwell "set forth the parameters and specifications" for the project. *Id.* In other words, it "designed" the system. § 8.01–250. It "was involved in determining issues related to safety, warning, testing, etc.," Plaintiff's Brief at 22, which again seems like design. Sandwell "was responsible for the interconnection of various piping lines"—for constructing them—and "was

---

**3.** *See also Birmingham v. Chesapeake & O. Ry. Co.*, 98 Va. 548, 37 S.E. 17, 17 (1900) (action of assumpsit subject to personal injury statute of limitations when declaration complains of personal injuries).

**4.** Sandwell disputes Jordan's description of its responsibilities. *See Sandwell Supplemental Brief* (Nov. 28, 2001) at 4. Even using Jordan's broader description, however, the Court still finds the statute of repose applicable.

aware of new systems and components," as a designer and constructor no doubt would be. The contract between Sandwell and Westvaco echoes terms similar to those that the Plaintiff uses in his brief. The evidence demonstrates that Sandwell's duties were those that the statute encompasses.

The contract between Westvaco and Sandwell does contemplate that Sandwell will "fabricate" certain items to be used in construction. Plaintiff's Appendix to Motion in Opposition to S.J., Exhibit 1, at 1. Even assuming that this fabrication took place—which Sandwell denies—Plaintiff's claim does not concern the *fabrication* of the component parts of the paper mill. Rather, the only expert who will testify for the plaintiffs will testify concerning the mill's defective *design*. There is no allegation that the individual parts of the mill were defectively *manufactured*, that the steel in the pipes was somehow impure or that the rubber of the seals in the pipes was cracked. Rather, the claim is that Sandwell negligently arranged for these parts to be put together in such a way as to injure the plaintiff.[5] Even if Sandwell fabricated paper mill parts, that is irrelevant to Jordan's claim of design malpractice, which is covered under the statute.

Sandwell meets the second prong of the statute.

### C. Of an Improvement to Real Property

The parties appear to agree that the services that Sandwell provided constituted an "improvement to real property" within the meaning of the statute. In any event, it appears that the definition of "improvement to real property" enunciated by the Virginia Supreme Court in *Danville Holding Corp. v. Clement*, 178 Va. 223, 16 S.E.2d 345, 349–50 (1941) applies here. *See Sandwell's Brief* at 7. Thus, Sandwell meets the third prong of the statute.

### D. But not a Manufacturer or Supplier of Equipment or Machinery

By its terms, the statute does not extend its protection to a "manufacturer or supplier of equipment or machinery." Such persons remain liable as if the statute of repose did not exist. The statute has a complicated but illuminating legislative history, which the Virginia Supreme Court discussed at length in *Cape Henry Towers v. National Gypsum Co.*, 229 Va. 596, 331 S.E.2d 476, 478–80 (1985), and which this Court will briefly recount now.

The original version of § 8.01–250 included only the first paragraph of the modern statute; it did not include the 'manufacturer or supplier' clause of the second paragraph. In *Wiggins v. Proctor & Schwartz*, 330 F.Supp. 350 (E.D.Va.1971), *aff'd mem. op.* 71–1952 (4th Cir. Mar. 8, 1972), the District Court for the Eastern District of Virginia applied the repose statute to bar a claim against a manufacturer of a two-ton jute machine that had been brought into defendant's factory and installed fourteen years earlier. The Court found that the machine itself, when brought in and bolted down, had become an improvement to real property. The statute of repose therefore extinguished the plaintiff's products liability action against the maker of the jute machine. In other words, the *Wiggins* Court found the statute of repose barred products liability actions once the product became a fixture.[6]

---

5. The distinction between defective design and defective manufacturing is one with strong roots in tort law. *See Restatement (Third) of Torts, Products Liability* § 2 (1998).

6. Under the Virginia Uniform Commercial Code, fixtures are "goods that have become so related to particular real property that an interest in them arises under real property law." Va.Code Ann. § 8.9A–102 (41) (Michie 2001).

The *Wiggins* decision caused considerable legislative gnashing of teeth. Apparently the General Assembly did not intend to abolish products liability actions against manufacturers whose products fortuitously became fixtures; rather, the legislators intended merely to protect architects, designers, and the like. The federal court, however, had swept equipment manufacturers into the statute, and had converted the statute into from a real improvements statute of repose to a general products liability statute of repose for fixtures. The Legislature added the second paragraph of § 8.01–250 to re-establish the products liability actions that *Wiggins* would have barred.

In 1974, this Court considered *Smith v. Allen–Bradley Co.*, 371 F.Supp. 698 (W.D.Va.1974) (Turk, J.). The action in *Smith* accrued in 1970; thus, even though the Legislature had amended § 8.01–250 in 1973, this Court considered the pre-amendment version of it. The Plaintiff in *Smith* sued over the defective condition of a "limit switch" in a die cutting press. Finding *Wiggins* indistinguishable and controlling, this Court found that the pre–1973 version of § 8.01–250 barred the plaintiff's products liability action. Nevertheless, this Court commented that the new version of § 8.01–250, which included the 'manufacturers and suppliers' clause, would have operated to allow the plaintiff's products liability action against the switch manufacturer. *Id.* at 700. This Court also noted Smith's contention that the original

version of the statute of repose would not bar actions based on "manufactured chattels which were added at a later time." *Id.*

The Virginia Supreme Court took up § 8.01–250 in 1985 in *Cape Henry Towers.* The court found that the 1973 amendment to § 8.01–250 reversed the *Wiggins* decision and restored the products liability causes of action for defective equipment or machinery that *Wiggins* would have barred. The Virginia Supreme Court also seized on this Court's comment regarding "manufactured chattels which were added at a later time" to draw a distinction between "ordinary building materials," which fall under the statute's protection, and "equipment and machinery," which does not. *Compare Cape Henry Towers,* 331 S.E.2d at 480 *with Smith,* 371 F.Supp. at 700.[7]

Considering the legislative history along with the holding of the Virginia Supreme Court in *Cape Henry Towers,* it is possible meaningfully to chart the scope of § 8.01–250: Before 1973, the statute barred products liability actions against manufacturers and suppliers when they designed or constructed their products and the products subsequently became improvements to real property. After 1973, the legislature restored those products liability actions by adding the second paragraph to § 8.01–250. In 1985, the Virginia Supreme Court created a subclass of products liability actions involving ordinary building materials and brought those actions once again un-

---

7. Under the Virginia Supreme Court's reasoning, the General Assembly was aware of this Court's alleged distinction between "equipment and machinery" on the one hand and "manufactured chattels which were added at a later time" (i.e. "ordinary building materials") on the other when it recodified § 8.01–250 in 1977. Because the General Assembly did not act to exclude ordinary business materials from the statute in 1977, the reasoning goes, the Assembly implicitly accepted the

*Smith* distinction and retained the repose immunity for ordinary building materials. In the *Smith* opinion, this Court had stated its view that *no* manufacturer was within the protection of the statute after 1973, even manufacturers of ordinary building materials. *Smith,* 371 F.Supp. at 700. The Virginia Supreme Court, the final arbiter of Virginia law, disagreed. *Cape Henry Towers,* 331 S.E.2d at 480.

der the protection of the statute. *Cape Henry Towers,* 331 S.E.2d at 481.

■ Keeping in mind the history of the statute, it is a relatively easy matter to apply it to the case at hand. The plaintiff here has clearly alleged design malpractice. His dispute is not with the defective condition of any discrete component of the "Foul Waste Condensate System," but is with the design of the system as a whole. He thinks that the different components of the system—the heat exchanger, the pipes, the stripper, the standpipe, the pre-heater, and others—were designed and put together in such a way that water spewed out the system and injured him. The plaintiff contends the items here are "equipment and machinery" within the meaning of the statute, and are not "ordinary building materials." Nevertheless, the plaintiff misses the initial classification between design malpractice actions (against architect/designers) and products liability actions (against manufacturer/designers). This action seems much more like a design malpractice action than a products liability action. The Foul Condensate Stripping System is not a machine hauled into the Westvaco factory, placed in some building, and bolted down (like the jute machine in *Wiggins*). Rather, the Foul Condensate Stripping System is so comprehensive in its functioning that it *is* the improvement to real property, not a discreet fixture put into some pre-existing improvement. The products liability subclassification between "machinery" and "ordinary building materials" is irrelevant because Sandwell is not being sued as a "manufacturer or supplier" of a fixture, but instead as a designer of an improvement. The actions that Sandwell took were never within the *Wiggins–Smith–Cape Henry Towers* line of cases that caused the legislative row in the first place.

Because Jordan sues Sandwell in its capacity as the designer of a system constituting an improvement to real estate and not as the manufacturer of a discrete fixture of that improvement, the second paragraph of § 8.01–250 allows the statute of repose to bar his action.

### E. Filed More than Five Years After Beginning of Repose Period

■ The final component of the § 8.01–250 is the repose period: a plaintiff must file his action against the defendant within "five years after the performance or furnishing" of the defendant's services. Sandwell argues that it had completed work on the Westvaco project and had received payment by December 1992, at the latest. If this is so, § 8.01–250 would bar the suit. Sandwell has submitted a supporting affidavit. The plaintiff responds that Sandwell was involved in the project as late as 1995. If that is so, the suit is timely.

The Plaintiff cites to several portions of the record which he says demonstrate the nature of Sandwell's involvement with the Westvaco project in the mid–1990's. Jordan Brief at 11–13. He claims that the record shows that Sandwell made alterations in the mid–1990's to systems involved in the accident. Nevertheless, Mr. Jordan's citations themselves reveal that Sandwell's involvement was very limited. For instance, he cites to a 1995 contract between Sandwell and Westvaco whereby Sandwell would "evaluate anchors, guides, and supports on the" pipes in the Foul Waste Condensate System. In other words, Sandwell was to inspect and repair the metal struts that held up the pipes. Plaintiff's Appendix Exhibit 6. Plaintiff's other cites confirm this interpretation: Sandwell worked on "pipe bridges" to make sure that the pipes would not fall down. Plaintiff's Brief at 12. It is evident

that this work was of a completely different nature than the 1991 work, and in 1995 Sandwell did not act to repair any condition that contributed to or caused Mr. Jordan's injuries, as Sandwell engineer Wally Sumner testified during his deposition. *See Sumner Dep.* at 18. The 1991 work had to do with the design of a facility. The 1995 work repaired metal supports for the pipes in the Westvaco mill. These pipes may have been pipes that Sandwell designed in 1991, but the work was not the same type of work. Furthermore, the record reveals that the 1995 contract was worth $15,000—hardly enough for a job anywhere near the size of the 1991 work. Plaintiff's Appendix Exhibit 6.

It follows, then, that the statute of repose will apply unless the time provisions of it are wide-ranging enough to "reset" anytime a defendant revisits the site on which it performed the initial work, even when the work is of a completely different type. The Court knows of no Virginia case law that is directly on-point. The Plaintiff cites to *Federal Reserve Bank of Richmond v. Wright*, 392 F.Supp. 1126, 1129 (E.D.Va.1975), for the proposition that the repose period begins to run "from the completion of the services and construction." This is true as far as it goes, but it sheds no light on how to determine what a "project" is for the purposes of the analysis. Mr. Jordan also cites to *McDonald v. Windermere Construction Co.*, 41 Va.Cir. 177 (Fairfax Co.1996), which involved a dispute against the developer of an apartment complex. Did the repose period begin when the allegedly defective stove was installed in one unit of the apart-

ment complex, or when the entire complex was complete? Judge Smith decided that it started when the entire project was complete. Still, *McDonald* is inapposite here because the construction of the apartment complex was one continuous work. If the developer in *McDonald* had returned to the complex two years later, under a different contract and for additional consideration, in order to fix a broken window in a different apartment unit than the one in which the allegedly defective stove was located, no one could seriously contend that the window repair would reset the repose period for any defect that might turn up in the whole complex.[8]

The case that more closely resembles this situation is one that Sandwell cites, *Fueston v. Burns and McDonnell Engineering Co.*, 877 S.W.2d 631 (Mo.App. 1994). *Fueston* was a personal injury action against the designers of a "melt shop." The plaintiff got his head caught in a crane at the shop and suffered severe injuries. The defendant pled that Missouri's ten year statute of repose barred the claims. In response, the plaintiff argued that the statute did not apply because the defendant had performed additional engineering services at the melt shop within ten years of the time that the plaintiff filed suit. The defendant pointed out that the additional services were to completely different components of the melt shop. The trial court granted summary judgment for the defendant, and the Missouri Court of Appeals affirmed: "Because the crane with surrounding structure is the improvement alleged by the Fuestons to be defective or unsafe ... it is the date on which the

---

8. No one could seriously contend that if Westvaco had hired a company other than Sandwell to do the 1995 work, the repose period for Sandwell's 1991 work would have begun anew. The Plaintiff would have the Court hold Sandwell liable simply because Westvaco happened to hire Sandwell rather than another company in 1995. To do so would likely discourage long-term business relationships as companies hesitated to restart the repose period on every contract they ever had with a business by performing some small additional service for it.

crane and the surround structure was completed that is relevant to the determination" of when the repose period begins. *Id.* at 637.

Consistent with *Fueston*, this Court holds that when there is no nexus of causation between the subsequent work and the system that causes the accident—when, as here, the subsequent work involves repairs that do not implicate the defects that allegedly caused injury to the plaintiff—then the original work is complete for the purposes of § 8.01–250. Repairs to the struts that hold up pipes in the Westvaco Mill had nothing to do with the reasons that the Foul Waste Condensate System spewed superheated water onto Mr. Jordan. Thus, the repose period began when Sandwell completed the initial work, a date no later than December 1992.

Sandwell satisfies that final prong of the repose test.

### F. Other Considerations

■ Finally, Mr. Jordan argues that the Court should deny Sandwell's motion for summary judgment on one final ground. According to him, Sandwell produced manuals that failed to warn Westvaco of the Foul Waste Condensate System's propensity to spew boiling water out of its standpipe. A manual is clearly not an improvement to real property, says Mr. Jordan, and therefore the statute of repose does not bar his claim. The question is whether a failure-to-warn-in-a-manual type claim will defeat the statute of repose in these circumstances. Is the manual separable from the improvement to real estate that § 8.01–250 covers? [9]

The majority of the cases bearing on this question deal with products liability statutes of repose—statute which extinguish causes of action against a manufacturer after a certain time period. However, the general principles are applicable to this case also. The great majority of the cases find that a manual is an inseparable part of the system or product that the plaintiff complains was defective. Thus, the statutes of repose extinguish *all* actions arising from the defective condition of the product, even when the specific claim is that the product's manual was defective. Typical of the analysis is *Butchkosky v. Enstrom Helicopter Corp.*, 855 F.Supp. 1251 (S.D.Fla.1993), which involved an allegedly defective helicopter that crashed and injured its occupants.

The plaintiff in *Butchkosky* found his claim against the helicopter manufacturer barred by Florida's twelve-year products liability statute of repose. However, the manufacturer issued manuals after the end of the repose period that failed to correct or warn of the design flaws. The plaintiff argued that because the manufacturer issued a manual within the repose period, his claim was not barred. The District Court rejected his argument, however, and found that the manual claim was not separable from the other, barred claims:

> To hold that [the manufacturer] should be liable because its manuals issued within the repose period did not provide adequate means of correcting the design flaw of the critical component, [sic] would be to circumvent the statute of repose by providing a back door to sue for the design flaw—ostensibly not for the design flaw itself, but for the failure of the manuals to adequately correct [sic] the flaw. *The result would be an evisceration of the statute of repose.* If a plaintiff is precluded by the statute of repose from suing for a design flaw in a product, the plaintiff must also be pre-

---

9. The plaintiff also complains about Sandwell's training sessions for Westvaco employees on essentially the same grounds. Because the Court finds the analyses indistinguishable, the court will discuss only the claims concerning the manuals.

cluded from suing for a failure to correct the design flaw, whether that failure be in the inadequacy of the test of a subsequently issued owner's manual or in repair guidelines subsequently sent to mechanics.

*Id.* at 1257 (emphasis supplied). Similarly here, to allow Mr. Jordan to sue for the failure of the manuals or training to address Sandwell's alleged design malpractice would be in essence to allow him to maintain suit for that design malpractice in violation of the statute of repose. If anything the rationale for barring suit is even stronger here than it was in *Butchkosky* because Sandwell here issued the manuals eight years before the lawsuit, in a state with a five-year real estate improvement statute of repose. In contrast, the twelve-year Florida statute of repose protected the manufacturer in *Butchkosky* even though it issued its manuals less than twelve years before the filing of the suit.

Most case law agrees with the *Butchkosky* analysis.[10] The Court knows of only one case in which the court allowed a claim based on manuals to circumvent a statute of repose. That case is *Driver v. Burlington Aviation, Inc.,* 110 N.C.App. 519, 430 S.E.2d 476 (1993). The North Carolina Court of Appeals there treated an aircraft manual as a completely separate product than the aircraft, and allowed a claim based on defects in the manual even though the underlying product, the aircraft, had been manufactured long enough ago that the North Carolina statute of repose would have barred a direct claim for defective design of the plane itself. *Driver* is distinguishable from the Mr. Jordan's case on at least two grounds.

First, the gravamen of Driver's complaint really was that the manuals were defective, not that the plane itself was defective. Driver's complaint did not even include an allegation that the plane was defective. He only maintained that the manual did not adequately instruct pilots on how to deal with airplane carburetor icing, a common condition and not one that renders an aircraft defective. *Id.,* 430 S.E.2d at 483. In contrast, Mr. Jordan's complaints here center upon the defective design of the Foul Condensate Waste System itself. Discovery has focused on the system design; the manuals are almost an afterthought.

Second, in *Driver* the manual was sold separately to the pilot. *Id.* It was a separate product, not intertwined with the product against which the statute of repose barred claims. Here, the manuals were supplied with the design services that Sandwell provided. Thus, they are legally indistinguishable from the services that § 8.01–250 covers.

### G. Conclusion to Jordan's Claim Against Sandwell

The statute of repose, Va.Code § 8.01–250, clearly bars Mr. Jordan's claim against Sandwell. There are no issues of material fact and Sandwell is entitled to judgment as a matter of law. Thus, Sandwell's motion for summary judgment against Mr. Jordan is **GRANTED**.

### III. U.S. FILTER'S MOTION FOR SUMMARY JUDGMENT AGAINST JORDAN

The second defendant, U.S. Filter, also moves for summary judgment pursuant to

---

**10.** *See Caldwell v. Enstrom Helicopter Corp.,* 230 F.3d 1155 (9th Cir.2000) (manual inseparable from system it explains); *Schamel v. Textron–Lycoming,* 1 F.3d 655 (7th Cir.1993) (for purposes of products liability statute of repose, provision of manuals inseparable from products liability action); *Alter v. Bell Helicopter Textron, Inc.,* 944 F.Supp. 531 (S.D.Tex.1996) ("... manufacturers' maintenance and repair manuals are not a 'separate' product or component upon which plaintiffs may base a claim to avoid a repose statute.").

*Fed.R.Civ.P.* 56. Like Sandwell, U.S. Filter bases its motion on Va.Code Ann. § 8.01–250. The observations that the Court has made with regard to § 8.01–250 and Sandwell are equally applicable to U.S. Filter. Mr. Jordan's claim against Westvaco is one for personal injuries. Although U.S. Filter's "Lump Sum Contract" [11] (like Sandwell's contract) includes the word "fabricate", U.S. Filter has produced an affidavit stating that it in fact fabricated nothing. *See U.S. Filter Mot. for S.J.* Ex. A ¶ 5. Mr. Jordan has been unable to dispute this. The mill was an improvement to real property, and the 'manufacturers and suppliers' clause does not apply. U.S. Filter's situation differs from Sandwell's so little that the Court need only discuss one prong of § 8.01–250 separately: the date that the repose period began to run.

■ U.S. Filter's involvement with the Westvaco mill in 1994–95 was more intensive than Sandwell's work. Sandwell has a $15,000 contract with Westvaco at the time, *see Jordan's Appendix* Ex. 6, but U.S. Filter's contract came at a price of $2,155,000, *see id.* Ex. 2. Furthermore, it appears that U.S. Filter reviewed the design of its 1990–91 work for the purpose of coordinating the operation of the older facilities with the addition that it was constructing. U.S. Filter replaced some of the older system's pumps. *Id.* Ex. 13 at 27. As U.S. Filter employee Craig van Dyke testified in his deposition, U.S. Filter "had to look at the entire system." *Id.* Ex. 13 at 28.

Nevertheless, to look at the system is not to alter it. U.S. Filter's expert testified unambiguously in his deposition that the accident would have happened even if U.S. Filter had never visited the site in 1994–95. *U.S. Filter Reply to Jordan* Ex.

A at 67. "The new effect didn't change those design conditions"—the ones that caused the accident—"*at all.*" *Id.* (emphasis supplied). "There is no net impact on the potential for these [allegedly dangerous] conditions to be created, whether that new effect was there or not." *Id.* Even Mr. Jordan's expert concedes that the 1995 changes were not part of the accident's chain of causation:

> Q. All right, and if fact, if that additional [1995] effect had not been added and all other things were equal, Clarence Jordan still would have gotten burned; is that right?
>
> A. Yes. The addition of the … effect in 1995 really did not play any part in the causation.

*McLaughlin Dep.* at 131.

Again, for subsequent work to cause a new repose period, there must be a nexus of causation between the modifications and the injury. There must be a new tort—the subsequent work must involve alterations that create or aggravate the defects that allegedly injured the plaintiff. Mere review of a preexisting design, without alteration of the preexisting structures of that design, is not enough to create a new repose period. Here, the system that injured Mr. Jordan was complete in 1991. *Cf. Fueston v. Burns and McDonnell Eng'g Co.*, 877 S.W.2d 631 (Mo.App.1994). It was not changed after that. Indeed, the uncontroverted testimony indicates that the additions to the system did not contribute to the accident in any way. The repose period for the system in question expired in 1996 at the latest, and § 8.01–250 therefore bars the suit.

---

11. *See infra* Part VI. (detailing 'Lump Sum Contract' and its relationship with other documents).

It follows that U.S. Filter's motion for summary judgment against Jordan must be **GRANTED.**

## IV. SANDWELL'S MOTION FOR SUMMARY JUDGMENT AGAINST WESTVACO

Sandwell moves for summary judgment on its contract claim against Westvaco. Under the contract between Westvaco and Sandwell, Sandwell was obligated to "indemnify, defend, and hold harmless" Westvaco "against any and all losses, costs, fines, penalties, or expenses ... resulting from any and all claims, actions, judgments, or demands" arising out of injuries to any person caused by "the negligent act(s) or omission(s)" of Sandwell.[12] Westvaco's General Conditions of Contract, *Westvaco's Brief Against Sandwell* Ex. B, at 16. Westvaco seeks indemnification under this clause for the one million dollars that it paid Mr. Jordan to settle Mr. Jordan's claims against it.

■ Sandwell raises but one argument in support of its motion for summary judgment: It contends that Va.Code Ann. § 8.01–250 bars Westvaco's indemnity action against it for the same reasons that § 8.01–250 bars Mr. Jordan's action against it. Westvaco replies that § 8.01–250 does not apply to contractual indemnity actions. In support of this proposition, it cites *Fidelity & Deposit Co. of Maryland v. Bristol Steel and Iron Works, Inc.,* 722 F.2d 1160 (4th Cir.1983). Sandwell rejoins that *Fidelity & Deposit Co* is distinguishable from these facts; if it is not, claims Sandwell, then the decision is flawed and this Court should overrule the Fourth Circuit. The Court finds neither argument well-taken; thus, the Court will deny Sandwell's motion for summary judgment against Westvaco on the authority of *Fidelity and Deposit Co.*

*Fidelity and Deposit Co.* involved a contract gone bad between the Pennsylvania Department of Transportation ("PenDOT") and Bristol Steel and Iron Works ("Bristol Steel"). The Fidelity and Deposit Company ("Fidelity") had acted as surety on the contract, and paid PenDOT when Bristol Steel went into default. Fidelity then sued Bristol Steel for the amounts that it paid to PenDOT. Bristol Steel raised § 8.01–250 as a defense. The trial court rejected the defense, and the Fourth Circuit affirmed. The Court of Appeals quoted the statute, which bars actions "for contribution or indemnity for damages sustained as a result" of an injury, like Mr. Jordan's, to which the act applies. The court then commented, *in toto:*

> It will be observed that the statute, by its express terms, is restricted in its application to what are in effect tort actions to recover for 'injury' to property or persons, and not to actions in contract. That such is the proper construction of the statute was recognized in *President and Directors, etc. v. Madden,* 505 F.Supp. 557, 576–77 (D.Md. 1980), where the district court held that a District of Columbia statute, similar in language to section 250, did not extend to 'causes of action sounding in contact.' On appeal we implicitly accepted this construction of the statute. 660 F.2d 91 at 94 (4th Cir.1981). Accordingly, since this action is not one sounding in tort but is one arising out of a specific written contract of indemnity, it is outside the scope of Section 250.

*Id.* at 1162 (footnote omitted). Sandwell attempts to explain this language away using three arguments.

First, Sandwell maintains that the real distinction in *Fidelity & Deposit Co.* is between indemnity claims arising from the

---

12. This language is contained in the standard "General Conditions of Contract" that West- vaco attaches to every contract that it proposes.

indemnitee's tort liability and indemnity claims arising from the indemnitee's contract liability. *Sandwell Brief* at 11. However, it is clear from the case that the relevant distinction concerns the nature of the indemnitor's obligation to the indemnitee, not the nature of the indemnitee's obligation to the injured party. In determining whether the statute of repose applies to an indemnity or contribution claim the question is why Sandwell is obligated to Westvaco, not why Westvaco is obligated to Jordan. *Fidelity & Deposit Co.* clearly distinguishes between indemnity claims "sounding in tort" and ones "arising out of a specific written contract of indemnity." Westvaco's claim is clearly the latter, a contract claim, and *Fidelity and Deposit Co.* therefore applies.

Second, Sandwell points out that contribution between joint tortfeasors is based on an implied contract between them to share expenses equally. *See Houston v. Bain,* 170 Va. 378, 196 S.E. 657 (1938). Nevertheless, this tort-based contribution is clearly within the plain language of the statute. It therefore follows, argues Sandwell, that contract actions are included in § 8.01–250. This argument also misses the mark. According to the Fourth Circuit, the terms "contribution" and "indemnity" in § 8.01–250 both refer to contribution between joint tortfeasors; neither refers to written contracts of indemnity. *Id.* at 1162 n. 3. Just because one type of pseudo-contract action is included in § 8.01–250, it does not follow that *all* contract actions are subject to the statute of repose. Formal contracts of indemnity are an entirely different creature than contribution between joint tortfeasors, and the Fourth Circuit found that the statute treated them differently.

Finally, Sandwell faults the reasoning of the Fourth Circuit because that court cited the *Madden* case. *Madden* held that the District of Columbia statute of repose did not apply to contract actions. In *Fidelity & Deposit Co.* the Fourth Circuit cited *Madden* to bolster its conclusion that the Virgin statute of repose did not apply to contract actions. Sandwell points out that *Madden* is a poor choice for citation because unlike the Virginia statute, the District of Columbia statute of repose on its face excludes all contract actions from its scope. This Court agrees that *Madden* does little to bolster the Fourth Circuit's reasoning in *Fidelity & Deposit Co.* Nevertheless, the reasoning of the Fourth Circuit is sound even without the *Madden* cite. The Virginia General Assembly has acquiesced in the decision by failing to pass legislation that overrules it. *Cf. Cape Henry Towers,* 331 S.E.2d at 479 (describing how General Assembly previously overruled construction of § 8.01–250 that it considered erroneous). The Fourth Circuit itself reaffirmed *Fidelity & Deposit Co.* in a 1991 case, *Delon Hampton & Assoc. v. Washington Metro. Transit Authority,* 943 F.2d 355, 362 (4th Cir.1991). Even if it disagreed with the reasoning of the Court of Appeals, this Court is obviously without power to overrule it. The Fourth Circuit must itself resolve any errors in its own decisions.

Sandwell has not made any other arguments in support of its motion. It follows, therefore, that its motion for summary judgment against Westvaco must be **DENIED.**

## V. SANDWELL'S MOTION TO CERTIFY QUESTION OF LAW

In addition, Sandwell asks this Court to seek guidance from the Virginia Supreme Court about whether the *Fidelity & Deposit Co.* decision accurately states Virginia law. Of course, certification of a question to the Virginia Supreme Court is a matter subject to this Court's discretion. *See Virgin Supreme Court Rule* 5:42(a).

At this point in time certification would unduly delay the proceedings. Furthermore, the Fourth Circuit decision that Sandwell attacks is nearly twenty years old; during that time, the General Assembly has passed no law suggesting that *Fidelity & Deposit Co.* is incorrect. Finally, given that the Fourth Circuit decided *Fidelity and Deposit Co.*, it would be more appropriate for the Fourth Circuit to correct any errors in the decision by overturning it or certifying the question itself than it would be for this Court to undermine a controlling precedent by certifying the question now. Sandwell's motion for certification is **DENIED**.

## VI. U.S. FILTER'S MOTION FOR SUMMARY JUDGMENT AGAINST WESTVACO

■ The final matter for disposition is U.S. Filter's motion for summary judgment on Westvaco's contractual indemnity claim against it. Westvaco maintains that its contract with U.S. Filter requires U.S. Filter to indemnify it for amounts paid to Mr. Jordan in settlement of Mr. Jordan's suit. U.S. Filter argues that the terms of the contracts do not require indemnification at this late date. Because the Court agrees, U.S. Filter's motion for summary judgment will be granted.

■ When contracts are unambiguous, the meaning of a contract provision is a question of law for the Court. *Richmond, Frederick & Potomac R.R. v. Hughes–Keegan, Inc.,* 207 Va. 765, 152 S.E.2d 28, 33 (1967). There are two different contracts under which an indemnification obligation might conceivably arise: one in 1990 and one in 1994. Westvaco sent a proposed contract to U.S. Filter in 1990, along with a copy of its "General Conditions of Contract." *See Westvaco Brief in Opp. to U.S. Filter,* Ex. A, B. U.S. Filter responded with its own "Lump Sum Contract," which provided that document exe-

cuted later in time prevails over document executed earlier in time. *Id.* Ex. C, at 2–3. In 1994, in the course of negotiating the second contract, Westvaco and U.S. Filter agreed that Westvaco's General Conditions of Contract would apply except for the exceptions noted in U.S. Filter document No. 940558. *Id.* Ex. D, at 3. Of course, as the Court has held *supra,* the underlying tort for which Westvaco seeks indemnification occurred in 1991, not in 1994–95. Ultimately, then, indemnification can arise only from the 1991 contract, not from the 1994 contract.

In the 1990 contract, Westvaco's General Conditions of Contract provide that the contract shall broadly indemnify Westvaco for claims arising from the contractor's (U.S. Filter's) negligence. *Id.* Ex. B at 16, ¶ 4(a). The indemnity provisions of the General Conditions of Contract contain no expiration date and specifically provide that the indemnity clauses shall "survive the contract." U.S. Filter's Lump Sum Contract, however, contains the following term numbered 4:

> *With the exception of liability for personal injuries,* the contractor's maximum liability under this Indemnity Agreement shall not exceed $8,000,000. The provision of the indemnity agreement shall also apply to the Work to the extent direct losses, costs, or expenses (excluding consequential damages) are $300,000.00 per occurrence. The Contractor's liability limit for losses, costs or expenses to the Work prior to the completion of the Work is $300,000.00 per occurrence. The liability limit is not applicable for claims occurring after Final Payment is made.
>
> The indemnity will be applicable until the completion of the Work and thereafter whenever the Contractor is on the Owner's premises until the expiration of the warranty period.

*Id.* Ex. C., at 19, ¶ 4 (emphasis supplied; pagination in original). Like the General Conditions of Contact, the Lump Sum Contract states that it "shall survive the contract." *Id.* Ex. C, at 19, ¶ 3. The warranty period in the contract was eighteen months. *Id.* Ex. C, at 13, ¶ 11(B). Because the project was completed on July 9, 1991, *see U.S. Filter Brief* Ex. A ¶ 10, the warranty period expired in November 1992.

Not surprisingly, the parties disagree on the interpretation of the contract. Their disagreements center in two areas.

First, Westvaco argues that the italicized portion of section 4 above, "with the exception of liability for personal injuries," applies to each clause in the paragraph. Thus, any expiration date contained in the third paragraph of section 4 does not apply to any action for personal injuries. U.S. Filter posits that the phrase "with the exception of liability for personal injuries" applies only to the first paragraph of section 4, since it appears only in that first paragraph. To hold otherwise, suggests U.S. Filter, would be to rewrite the contract as:

4. With the exception of liability for personal injuries,

 (a) the contractor's maximum liability under this Indemnity Agreement shall not exceed $8,000,000.

 (b) the provision of the indemnity agreement shall also apply to the Work to the extent direct losses, costs, or expenses (excluding consequential damages) are $300,000.00 per occurrence. The Contractor's liability limit for losses, costs or expenses to the Work prior to the completion of the Work is $300,000.00 per occurrence. The liability limit is not applicable for claims occurring after Final Payment is made.

 (c) the indemnity will be applicable until the completion of the Work and thereafter whenever the Contractor is on the Owner's premises until the expiration of the warranty period.

U.S. Filter argues that this would constitute an unacceptable reformation of the contract.

The Court finds that U.S. Filter's construction of the contract is the more reasonable one. The phrase in dispute, "with the exception of liability for personal injuries," seems tied in with the sentence of which it is a part, a sentence which addresses the contractor's "maximum liability." Westvaco would have the Court supply the phrase to clauses (b) and (c). However, it seems unnatural to add the phrase to clause (b), which addresses a "liability limit," or to clause (c), which does not contain the word "liability" at all. The general thrust of section 4 is to limit U.S. Filter's liability; each paragraph of the section contains a limitation of some kind. Given the likelihood of a personal injury claim at some point in the life of the mill, to read the contract as Westvaco suggests would be to allow the exception to swallow up the limitation. Such a construction seems unreasonable, and a court must avoid unreasonable constructions. *See generally* 4A M.J. *Contracts* § 43 (1999) (citing cases that hold construction of contracts must be reasonable). Finally, the plain language of the writing indicates that the phrase excluding personal injuries from section four's scope, which if present would create liability for U.S. Filter in this situation, simply does not appear anywhere in clause 4(c), which creates an expiration date for the indemnity obligation. U.S. Filter cannot be liable under the 1990 contract.

Finally, Westvaco points to language in section 3 of the 1990 indemnity agreement

which provides that the provisions of the Lump Sum Contract shall not "negate" or "abridge" independently existing indemnity obligations. *Westvaco Brief against U.S. Filter* Ex. C, at 19, ¶ 3. Thus, Westvaco maintains that the language of the Lump Sum Contract cannot abridge the indemnity clauses contained in the General Conditions of Contract. However, in 1990 U.S. Filter never agreed to the General Conditions of Contract. When it received Westvaco's proposed contract (which included the General Conditions of Contract), it sent back its own Lump Sum Contract. No party has cited Va.Code § 8.2–207 (the Uniform Commercial Code provision regarding battles between forms) or argued that it applies to this situation; rather, the common law of contracts applies.[13] A purported acceptance that varies the terms of an offer is actually a rejection and counteroffer. *See Chittum v. Potter*, 216 Va. 463, 219 S.E.2d 859, 864 (1975); *Wards Co. v. Lewis & Dobrow*, 210 Va. 751, 173 S.E.2d 861, 864–65 (1970). Under the common law, U.S. Filter rejected Westvaco's offer (the "General Conditions of Contract") and made a counteroffer (the "Lump Sum Contract"). The General Conditions of Contract were never binding; they never created any indemnity obligation in 1990. Thus, there was no preexisting indemnity obligation for page 19, ¶ 3 of the Lump Sum Contract not to change.

Because the contract between Westvaco and U.S. Filter forecloses any possibility that Westvaco might recover from U.S. Filter for the amount it paid to Mr. Jordan, the Court will **GRANT** U.S. Filter's motion for summary judgment.

**13.** Even if the parties had cited § 8.2–207, it does not apply here. Article 2 of the U.C.C. applies only to sales of goods. Va.Code § 8.2–102. "Goods" are "movable things."

## VII. CONCLUSION

Sandwell's motion for summary judgment against Mr. Jordan is **GRANTED**. Sandwell's motion for summary judgment against Westvaco is **DENIED**. Sandwell's motion to certify a question of law to the Virginia Supreme Court is **DENIED**. U.S. Filter's motions for summary judgment are **GRANTED** both as to Mr. Jordan and as to Westvaco.

### ON THE MOTION FOR RECONSIDERATION

This matter is before the Court on Plaintiff Jordan's motion to reconsider this Court's December 3, 2001 order that granted summary judgment to the two defendants in this case, Sandwell, Inc. ("Sandwell") and U.S. Filter Corporation ("U.S.Filter"). The motion is meritless as to Sandwell; the Court will therefore deny the motion to reconsider as to it. As to U.S. Filter, the motion has some merit; the Court will therefore grant it in part and reinstate upon the docket one of Plaintiff's three negligence claims against that corporation, as more fully discussed below.

### *DISCUSSION*

The Court has previously recited the facts of this case in some detail in its memorandum opinion dated December 3, 2001. Thus, a summary of those facts will suffice here. The plaintiff alleges that the design of the Westvaco Paper Mill in Covington was defective. The designers are the defendants. When on the premises one day as a temporary employee, superheated water spewed out of a pipe and burned the plaintiff severely. The defendants raised the Virginia statute of repose, Va.Code § 8.01–250, as a defense to the

Va.Code § 8.2–105(1). The design services that U.S. Filter provided are clearly not "goods."

claims. They stated that more than five years had passed since their work on the design in 1991 and that the statute therefore barred the claims. The plaintiff argued that the statute of repose did not apply for a variety of reasons, and that in any case both defendants worked on the plant within five years of the time he filed his lawsuit.

The Court addressed the arguments in its December opinion. It found that the statute of repose did apply to the claims. With regard to Sandwell, it found that the work Sandwell did on the plant in 1995 had nothing to do with the conditions that eventually caused Mr. Jordan's injury. Similarly, the Court found it undisputed that U.S. Filter's 1995 expansion work did not have any effect on the conditions that led to the accident. The 1995 visits were therefore not relevant to the statute of repose analysis. The Court granted summary judgment to the defendants and dismissed the case on that basis. It is this decision that the plaintiff asks the Court to reconsider.

Looking back on its opinion, the Court is still satisfied that the opinion is correct as far as it goes. The statute of repose does apply to this action. With regard to Sandwell, the plaintiff has failed to raise any persuasive arguments that the Court's initial analysis of the case was incorrect. The Plaintiff's motion to reconsider will therefore be denied as to Sandwell.

The claim against U.S. Filter, however, requires more thought. Mr. Jordan has alleged three separate and distinct causes of action against U.S. Filter. First, he claims that U.S. Filter negligently designed the Westvaco mill in 1990–91 (the "1991 claims"). Second, he states that when U.S. Filter returned to the plant in 1995 to expand the Westvaco facility, it should have corrected the initial design flaws and failed to do so (the "1995 claims"). Third, he declares that when Westvaco returned to the plant in 1996 and 1997 to analyze problems that Westvaco was having with its facilities, it should have discovered the existence of the problem that led to Mr. Jordan's injury (the "1996 and 1997 claims"). In his motion for reconsideration, Mr. Jordan argues that the court was incorrect in its resolution of the first claim and failed to consider the second two claims.

The Court continues to believe that its resolution of the first claim was correct. Furthermore, contrary to the plaintiff's suggestion, the Court did address the second claim in its opinion. *See Memorandum Opinion* at 418–19. The Court found that no new tort took place in 1995 because whatever changes U.S. Filter made were outside the accident's chain of causation. Mere review of the defective design, for the purpose of adding an element to that design, was insufficient to create a duty to report deficiencies in the preexisting design. U.S. Filter took the plant as it found it. "Mere review of a preexisting design, without alteration of the preexisting structures of that design, is not enough to create a new repose period." *Memorandum Opinion* at 418–19.

The plaintiff's third cause of action is different, however. The plaintiff has submitted evidence that Westvaco hired U.S. Filter in 1996 and afterwards to troubleshoot problems with the paper mill components that caused the accident. *Declaration of Kenneth Cole* ¶¶ 6–10. Mr. Jordan has also submitted evidence that U.S. Filter fell below the applicable standard of care during those troubleshooting visits, *see Declaration of Kenneth McLaughlin* ¶¶ 8–11, and that on those occasions U.S. Filter should have discovered the problem that led to Mr. Jordan's injury, *id.* ¶ 13. These are independent torts, separate and apart from any claims arising out of the 1991 or 1995 contracts.

The statute of repose therefore has no effect on them and it was error for the Court to dismiss them.[1]

U.S. Filter tries to enlarge the scope of this Court's December opinion so that it covers the 1996 and 1997 incidents also. The defendant attempts to lump together the 1995 failure-to-warn claims, which occurred in the context of the expansion project, with the 1996 and 1997 failure to warn claims, which took place in the context of troubleshooting visits. However, these are two different types of claims. The issue is not, as U.S. Filter asserts, a matter of the repose period resetting in some way because of the later visits. As the Court's December opinion makes clear, the statute of repose bars claims arising from the 1991 design, whether those claims are based upon contract or tort, and whether they concern the defective design of strippers or defective preparation of manuals. The 1995 claim, in essence an independent tort, fails because the undisputed evidence is that no action that U.S. Filter took during the 1995 expansion caused the accident, and because U.S. Filter in its capacity as the designer of an expansion project had no duty to inspect the plant and warn of already existing design defects in 1995. Rather, the issue

is whether the statute of repose applies to a separate tort at all.

In that vein, it is not logical to assume that because the statute of repose bars one tort (such as the alleged 1991 tort here), a defendant has a license to commit other, future torts (like alleged negligent inspections in 1996 and 1997) with impunity.[2] In applying the statute of repose to bar Plaintiff's 1991 claims, the Court did not extinguish "any other possible" negligence claims by Mr. Jordan—only those theories of liability that have, as their operative facts, allegedly improper acts in 1991. The 1996 and 1997 claims are based on a negligent inspection—a separate and independent act of negligence—that failed to reveal an already existing negligent design. They are not based on the negligent design itself. Indeed, the Court comments that under the facts of this case, it may be improper for the jury to know who is responsible for the initial negligent design. Those issues are for another day. In any event, the statute of repose does not apply to the 1996 and 1997 negligence claims, and material issues of fact exist regarding them. It follows that summary judgment was improper on those claims.

Mr. Jordan's motion to reconsider will therefore be **GRANTED IN PART** only as

1. In the Court's defense, the parties did not argue strenuously the claims from 1996 and 1997; rather, they focused on the statute of repose issues surrounding the 1991 and 1995 claims. The 1996 and 1997 claims got "buried" in the mound of paperwork that the parties filed on other issues.

2. To put it another way: It seems to the Court that if a third party had come to Westvaco in 1995 to perform the expansion work, it would be very difficult to hold that party liable for the defects in the 1991 design simply because that party added additional effects to an already-defective facility. In that situation it would be unfair to hold U.S. Filter liable when a third company would not be liable merely because that U.S. Filter had per-

formed previous work on the plant. Similarly here, there would be no question that if Westvaco had retained a third party company to troubleshoot the plant in 1996 and 1997, and that third party company negligently had failed to detect the problem that injured Mr. Jordan, the plaintiff would state a cause of action against that third party company. It would be equally unfair here to allow U.S. Filter to escape liability, when a third party would be liable, merely because U.S. Filter had performed earlier work which was now under the protection of the statute of repose. Sauce for the proverbial goose is sauce for the gander: Work performed previously has no effect on separate torts that accrue afterwards.

to his 1996 and 1997 claims against U.S. Filter, and **DENIED IN PART** as to his other claims against U.S. Filter and his claims against Sandwell. An appropriate order will this day enter.