**KOHL'S DEPARTMENT STORES, INC., et al., Plaintiffs,**

v.

**TARGET STORES, INC., et al., Defendants.**

**No. CIV.A. 3:02CV633.**

United States District Court, E.D. Virginia. Richmond Division.

Nov. 7, 2003.

R. Webb Moore, Esquire, Lisa S. Goodwin, Esquire, Hirschler Fleischer PC, Richmond, VA, Robert O. Fleming, Jr., Esquire, Smith, Currie & Hancock, Atlanta, GA, for Kohl's.

William L. Thurston, Esquire, Lisa K. Duley, Esquire, Marchant Thurston Honey & Blanks LLP, Richmond, VA, for Chesterfield Crossing.

Everette G. Allen, Jr., Esquire, Robert L. Harris, Jr., Allen & Allen, Richmond, VA, for Ukrop's.

Dabney J. Carr, IV, Esquire, Michael A. Montgomery, Esquire, Troutman Sanders LLP, Richmond, VA, for Target.

William R. Mauck, Jr., Esquire, Edward L. Haskell, Esquire, Williams Mullen PC, Richmond, VA, for Williams Co.

Dennis R. Carluzzo, Esquire, Tracy C. Hudson, Esquire, Hudson & Carluzzo, Manassas, VA, Charles L. Williams, Esquire, Blackwell N. Shelley, Jr., Esquire, Butler, Williams & Skilling, Richmond, VA, William J. Brennan, IV, Esquire, Charles R. Bruton, Esquire, C. Randolph Ross, Buchanan Ingersoll, Philadelphia, PA, for ReUse.

Dennis R. Carluzzo, Esquire, Tracy C. Hudson, Esquire, Smith, Hudson, Alston & Carluzzo, Manassas, VA, for S.W. Rodgers.

## MEMORANDUM OPINION

PAYNE, District Judge.

This consolidated action involves claims for damages to the buildings that make up the Chesterfield Crossing Shopping Center ("the Project"), a retail shopping establishment located in Chesterfield County, Virginia. The four buildings that make up the Project have sustained significant structural damage which began to appear shortly after construction. The owners of three of the four buildings each filed actions against Target Stores, Inc. ("Target"), the developer/owner of the Project, seeking contractual indemnification for the damage to their respective buildings. Target filed a third-party complaint against the site contractor on the same theory. A number of third-party indemnity claims ensued. The parties allege that Xtra Fill, a synthetic fill material consisting principally of fly ash sold by ReUse Technologies, Inc. ("ReUse"), caused this damage. ReUse has moved for partial summary judgment on several of the third-party claims pending against it, asserting that those claims based on negligence theories are time-barred under Virginia Code § 8.01–250, a statute of repose protecting improvers of real property, and that the indemnity claims sounding in warranty are time-barred under Virginia Code § 8.2–725, the statute of limitations contained in the Virginia Uniform Commercial Code ("UCC").

## STATEMENT OF FACTS

At some point before May 1997, Target and Ukrop's Supermarkets, Inc. ("Ukrop's") purchased land at a site later developed as the Project.[1] In May 1997, Kohl's Department Stores, Inc. ("Kohl's") and Ukrop's, along with Chesterfield Crossing Shopping Center, L.L.C. ("CCSC"), entered into a site development agreement with Target. Under this agreement, Target agreed to convey a portion of its land to CCSC and to perform all of the site development on the Project for CCSC, Kohl's and Ukrop's.

Target contracted the site development work to the general contracting firm of

---

**1.** The facts and procedural posture of this case are set forth in great detail at *Kohl's* *Department Stores, Inc. v. Target Stores, Inc.,* 214 F.R.D. 406 (E.D.Va.2003).

Williams Company of Orlando, Inc. ("Williams"). Williams, in turn, contracted with various subcontractors; one of which was S.W. Rodgers Co., Inc. ("Rodgers") which Williams retained to perform various earth-moving services.[2] Rodgers, in turn, purchased the Xtra Fill from ReUse.

After the Project was completed, the buildings owned by Target, Kohl's, Ukrop's and CCSC began to experience cracks in the floors and walls. All parties but ReUse assert that the damage to the buildings is the result of the expansion of the Xtra Fill. The cause, says ReUse, is not the expansion of the Xtra Fill, but instead is the result of the failure properly to prepare the subsoil on which the Xtra Fill was placed. ReUse contends that this failure caused soil settlement which, in turn, caused the damage to the buildings.

Kohl's filed a complaint against Target (the "Kohl's action"). Upon receipt of this complaint, Target impleaded Williams which then filed a fourth-party complaint against, inter alia, Rodgers. Rodgers then filed a fifth-party complaint against ReUse seeking indemnity for any sums it was required to pay by virtue of Williams' indemnity action against Rodgers. Rodgers' various indemnity claims against ReUse are grounded in theories of both negligence and breach of warranty.

CCSC filed a complaint against Kohl's (the "CCSC action") which, in turn, filed a third-party complaint against Target, predicated on a contractual indemnity provision. Target filed a third-party complaint against Williams, which, in turn, impleaded Rodgers. Rodgers then filed a sixth-party complaint against ReUse seeking indemnity against all sums that Rodgers was required to pay to Williams. As in the Kohl's action, the Rodgers' indemnity claims are founded in both negligence and breach of warranty theories.[3]

The actions filed by Kohl's, Ukrop's, and CCSC were consolidated. ReUse has moved for summary judgment on Rodgers' allegations that sound, in whole or in part, in tort, relying on Virginia Code § 8.01–250, a statute of repose protecting certain improvers of real property. ReUse also has moved for summary judgment on all of Rodgers' claims that sound, in whole or in part, in warranty, contending that those claims are time-barred by the statute of limitations set forth in the UCC, Virginia Code § 8.2–725. For the reasons that follow, ReUse's motions for summary judgment on Rodgers' negligence-based indemnity claims are granted and its motions for summary judgment on Rodgers' warranty-based indemnity claims are denied.

## DISCUSSION

The standards applicable to summary judgment motions are well established. Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.

---

**2.** Williams also contracted with Engineering Consulting Services ("ECS"), which provided engineering testing and inspection services, and McKinney & Co. ("CTI"), which provided soils engineering services.

**3.** In yet another action, Ukrop's filed a complaint against Target (the "Ukrop's action"). Target then impleaded Williams, which, in turn, impleaded Rodgers who then filed a fifth-party complaint against ReUse identical in all relevant respects to the complaint it filed against ReUse in the previously described Kohl's action. Ukrop's, however, has settled its claims with Target. Thus, although ReUse filed motions for summary judgment against Rodgers respecting the Ukrop's action, in light of Ukrop's settlement, those motions are moot and are not addressed in this opinion.

2548, 91 L.Ed.2d 265 (1986). In reviewing a motion for summary judgment, the court must view the facts, and any inferences drawn from these facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nguyen v. CNA Corp.,* 44 F.3d 234, 236 (4th Cir.1995). A fact is material "when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the non-moving party on the basis of such issue." *Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.,* 847 F.Supp. 389, 394 (E.D.Va.1994). The nonmoving party is entitled to have its version of all that is disputed accepted, all conflicts resolved in its favor, and to have the benefit of all favorable legal theories invoked by the evidence. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp.,* 981 F.2d 160, 163 (4th Cir.1992). These precepts inform and guide the resolution of the motions filed by ReUse.

## I. The Statute Of Repose

ReUse argues that, because Rodgers sued ReUse more than five years after ReUse delivered the Xtra Fill to the Project, Rodgers' claims sounding in tort[4] are barred by Virginia's statute of repose. Va. Code Ann. § 8.01–250.[5] As explained below, ReUse's motions based on the statute of repose contain no disputed issues of material facts. Moreover, an analysis of applicable case law illustrates that ReUse prevails on that theory as a matter of law.

Virginia's statute of repose for improvers of real property provides in relevant part:

> No action to recover for any injury to property, real or personal ... arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction, or construction of such improvements to real property more than five years after the performance or furnishing of such services and construction. The limitation prescribed in this section shall not apply to the manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property ... rather each such action shall be brought within the time next after such injury occurs as provided in [Virginia's various statutes of limitations].

Va.Code. Ann. § 8.01–250.

■ Citing Rodgers' response to ReUse's Request for Admission Number 13, ReUse posits, as undisputed, the fact that its last delivery of Xtra Fill to Rodgers for use on the Project occurred in July 1997. It also is undisputed that Rodgers commenced its third-party actions against ReUse in the Kohl's and CCSC actions on November 8 and December 18, 2002 respectively, dates more than five years after July 1997. By its terms, the statute of repose applies to actions in indemnity and,

---

4. ReUse concedes that the statute of repose does not bar claims based on breach of warranty. *See Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1162 (4th Cir.1983). Thus, ReUse relies solely on its companion motions for summary judgment based on the UCC statute of limitations to support its motion for summary

dismissal of Rodgers' warranty-based indemnity claims.

5. Because this Court is sitting in diversity, it applies the substantive law of Virginia, including the statute of repose. *See Jordan v. Sandwell, Inc.,* 189 F.Supp.2d 406, 410 (W.D.Va.2002).

by decisional law, it applies to negligence-based indemnity claims, but not to those based in warranty. *Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1162 (4th Cir.1983). Thus, ReUse asserts that Rodgers' negligence-based indemnity claims are time-barred under § 8.01–250 and that Rodgers can raise no material issues of disputed fact to refute this outcome.

Rodgers makes two arguments in response. First, Rodgers argues that Xtra Fill is "equipment or machinery," not ordinary building material and, therefore, says Rodgers, the supplier of Xtra Fill does not fall within the reach of § 8.01–250. Rodgers also asserts that whether Xtra Fill is an ordinary building material or "equipment or machinery" is a factual question to be resolved by the jury.

Second, Rodgers argues that, even if the statute of repose applies, the start date for the running of the five-year period is the date that the Project was completed in its entirety or, in the alternative, the date that all of the Xtra Fill was installed completely at the Project. In other words, Rodgers disagrees with ReUse's argument that the statute began to run on the last date that ReUse delivered Xtra Fill to the Project.

Although there is some dispute as to the exact date, the evidence tends to show that the Project was not finally completed until approximately July 1998. Hence, Rodgers argues that, if the statute of repose did not begin to run until completion of the Project, the statute of repose would not have expired until sometime in July 2003, well after Rodgers filed its third-complaints against ReUse.

In the alternative, Rodgers contends that the Xtra Fill was not installed completely until April 1998, less than five years before it filed against ReUse. In support of this theory, Rodgers points to several items of evidence which, according to Rodgers, permit an inference that installation was not complete until April 1998. That evidence, says Rodgers, is sufficient to send the statute of repose defense to the jury for resolution.

Those several contentions are addressed in turn.

## A. Rodgers' Assertion That Xtra Fill Is Not Ordinary Building Material

The assessment of Rodgers' contention that Xtra Fill is not an ordinary building material, and, therefore, is excluded from the protection of § 8.01–250, is informed by examining the legislative history of § 8.01–250. The original version of § 8.01–250 contained no exceptions for suppliers of equipment, machinery, or other articles; it simply protected individuals and entities who made improvements to real property.[6]

Construing the original version of the statute, the court, in *Wiggins v. Proctor & Schwartz,* 330 F.Supp. 350 (E.D.Va.1971), applied the statute to bar a personal injury claim against the manufacturer of a jute-picking machine that had been bolted to the floor of the textile factory in which it had been located. The court held that, because it had been bolted down, the machine had become an improvement to the real property. Because it was an improvement to real property, the statute of repose protected the manufacturer from liability in an action that had been filed more

---

**6.** The statute of repose originally was codified at § 8–24.2. Old § 8–24.2 and new § 8.01–250, however, contain virtually identical language. Moreover, all courts apply the decisional law construing § 8–24.2 when address-ing issues arising under the more recently enacted § 8.01–250. *See generally Cape Henry Towers v. Nat'l Gypsum Co.,* 229 Va. 596, 331 S.E.2d 476, 478 (1985) (discussing legislative history of statute of repose).

than five years after the improvement had been made.

The decision in *Wiggins,* and others reaching similar results, "caused considerable gnashing of teeth" in the General Assembly, many of whose members expressed the view that the judiciary erroneously had turned the statute from a real property improvements statute of repose to a general products liability statute of repose for fixtures. *Jordan v. Sandwell, Inc.,* 189 F.Supp.2d 406, 413 (W.D.Va. 2002). As observed in *Jordan:*

> [T]he general assembly did not intend to abolish products liability actions against manufacturers whose products fortuitously become fixtures; rather, the legislators intended merely to protect architects, designers, and the like. The [courts], however, had swept equipment manufacturers into the statute, and had converted the statute ... from a real improvements statute of repose to a general products liability statute of repose for fixtures.

*Jordan,* 189 F.Supp.2d at 413. To remedy that circumstance, the General Assembly, in 1973, added the second paragraph to the statute of repose to remove from its reach "the products liability actions that *Wiggins* would have barred." *Id.* This amendment specifically excluded suppliers and installers of equipment, machinery, or other articles from the protection of the statute of repose.

In 1985, the Supreme Court of Virginia considered the effect of the 1973 amendment in *Cape Henry Towers v. Nat'l Gypsum Co.,* 229 Va. 596, 331 S.E.2d 476 (1985), there holding that the 1973 amendment overruled the decision in *Wiggins.* The court also explained that the amended

statute drew a sharp distinction between "ordinary building materials" and "machinery or equipment." *Cape Henry Towers,* 331 S.E.2d at 480. The court stated:

> We conclude that the General Assembly intended to perpetuate a distinction between, on the one hand, those who furnish ordinary building materials, which are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors, and, on the other hand, those who furnish machinery or equipment. Unlike ordinary building materials, machinery and equipment are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties, voidable if the equipment is not installed and used in strict compliance with the manufacturer's instructions. Materialmen in the latter category have means of protecting themselves which are not available to the former. We construe § 8.01–250 to cover the former category and exclude the latter.

*Id.*[7]

Following the lead of the Supreme Court in *Cape Henry Towers,* subsequent decisions have tended to resort to policy-based factors in attempting to distinguish between "equipment or machinery" and "ordinary building materials" (the inquiry required by the amended statute as explicated by *Cape Henry Towers* ). Those factors include:

● Whether the item in question was under the control of its manufacturer during its installation, *see Richmond v. Madison Mgmt. Group, Inc.,* 918 F.2d 438, 445 (4th Cir.1990) (noting that defendant exercised great control over

---

7. In *Grice v. Hungerford Mech. Corp.,* 236 Va. 305, 374 S.E.2d 17, 19 (1988), the Supreme Court of Virginia invoked the doctrines of ejusdem generis and noscitur a sociis and

held that the phrase "other articles" as used in § 8.01–250 adds no new or further categories to those already excluded from operation of the statute.

installation of cement pipe and finding that pipe constituted equipment);

- Whether the item was interchangeable or essentially fungible with other building materials, *see Cooper Indus., Inc. v. Melendez,* 260 Va. 578, 537 S.E.2d 580, 590 (2000) (finding that switchgear and circuit box were not fungible or generic materials and thus constituted equipment); and

- Whether the item was manufactured specifically for a specific project and accompanied by instructions and guidance for the installation of the item into that specific project, *see Grice v. Hungerford Mech. Corp.,* 236 Va. 305, 374 S.E.2d 17, 18–19 (1988) (noting that whether manufacturer provides explicit instructions for installation of product is relevant to ordinary building materials versus machinery or equipment inquiry), *and Luebbers v. Fort Wayne Plastics, Inc.,* 255 Va. 368, 498 S.E.2d 911, 913 (1998) (finding that manufacturer of vinyl liner, aluminum coping, and steel braces did not specif-

ically design them for use in particular pool and holding that the items were ordinary building materials).

Rodgers asserts that application of these criteria here leads to the conclusion that Xtra Fill is equipment or machinery, not an ordinary building material. Says Rodgers: "the Xtra Fill in question was certainly under the control of its manufacturer, it was not interchangeable with other structural fills, it was specified for the project as an acceptable structural fill and the manufacturer provided instruction and guidance for its installation. These are all questions for the jury." Rodgers' Mem. in Opp., at 8.[8]

### (i) Whether ReUse Exercised Control Over The Installation Of The Xtra Fill

■ Rodgers argues that ReUse exercised control over the installation of the Xtra Fill and that this fact illustrates that Xtra Fill is not an ordinary building material. In support of that assertion, Rodgers relies on the undisputed facts that ReUse

**8.** Rodgers cites *Eagles Court Condo. Unit Owners Ass'n v. Heatilator, Inc.,* 239 Va. 325, 389 S.E.2d 304 (1990), for the proposition that the "ordinary building materials" versus "equipment or machinery" question is a fact-based inquiry. In *Heatilator, Inc.,* the plaintiff sued the manufacturer of a fire-place system. The plaintiff alleged that this fire-place system had caused a fire which had caused property damage in plaintiff's condominium complex. The defendant argued in a special plea that plaintiff's claim was time-barred by § 8.01–250. The trial court granted defendant's plea in a final order from which the plaintiff appealed. On appeal, the Supreme Court of Virginia noted that, in granting the defendant's special plea, the trial court had neglected to conduct the "factual determination" of whether the fire-place systems constituted "machinery or equipment" or "ordinary building materials." *Heatilator, Inc.,* 389 S.E.2d at 306. Because the trial court record was silent as to the machinery or equipment versus ordinary building materials inquiry,

the case was remanded. *Id.* at 307 (holding that trial court erred in holding plaintiff's claims time-barred without "first making the dispositive factual determination whether the Heatilator systems were 'machinery' or 'equipment' within the meaning of Code § 8.01–250"). Rodgers correctly notes that in *Heatilator, Inc.,* the court described the machinery or equipment versus ordinary building materials inquiry as a factual question. However, contrary to Rodgers' view, that *per force* does not foreclose summary judgment. *See, e.g., Jordan,* 189 F.Supp.2d at 413–14 (resolving the applicability of § 8.01–250 at summary judgment stage); *Taylor v. Wal–Mart Stores, Inc.,* No. 2:99CV00068, 2001 WL 420363 (W.D.Va. April 5, 2001), *modified by,* 26 Fed.Appx. 242 (4th Cir.2002) (same). In order to defeat ReUse's motion for summary judgment, Rodgers must demonstrate the existence of some genuinely disputed material fact in support of its argument that Xtra Fill is not an ordinary building material. As discussed in the text, Rodgers cannot do so.

representatives visited the job site regularly, observed the progress of the Project, and made themselves available to answer questions about Xtra Fill. However, the facts that ReUse representatives were present on an occasional, or even a regular, basis during the installation of the Xtra Fill and that they answered questions about the product do not raise a triable issue of fact to support Rodgers' contention that ReUse exercised control over the installation of the Xtra Fill. *Compare with Madison Mgmt. Group, Inc.,* 918 F.2d at 445 (finding that materials at-issue constituted equipment after noting that defendant "assisted the engineer and the City in designing th[e] job ... [and] collaborated [with plaintiff] in developing the shop drawings and lay schedules"). ReUse does not suggest otherwise.[9]

Moreover, those facts are not the only relevant undisputed facts of record. For example, Rodgers adamantly asserts that representatives from Williams had the ultimate responsibility for overseeing work at the project.[10] Moreover, according to Rodgers, two of the engineering firms involved with the Project—CTI and ECS—actually oversaw the installation of the Xtra Fill. ReUse does not dispute that contention. *Compare with Cape Henry Towers,* 331 S.E.2d at 480 (noting that ordinary building supplies "are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors"). All told, therefore, there is no evidence to support Rodgers' contention that ReUse exercised control over the installation of the Xtra Fill.

### (ii) Whether Xtra Fill Is An Essentially Fungible Material

■ Rodgers argues that Xtra Fill is not interchangeable with other materials and that, therefore, it is not an ordinary building material. To support its argument that Xtra Fill is not interchangeable with other fills, Rodgers points to statements of the geotechnical engineer hired for the Project. *See* Exhibit 1, appended to Rodgers' Mem. in Opp. (the "Drahos report"). The Drahos report sets forth the findings and recommendations of the geotechnical engineer assigned to the project. In discussing an appropriate fill material for use on the Project, the Drahos report states that "compacted structural fill should consist of material classifying CL, ML, SC, SM, SP, SW, GC, GM, GP, or GW per ASTM D–2487 with a Plasticity Index of 25 or less. . . . Xtra Fill is considered suitable for use as a structural fill on this project. This material usually classifies as SM or ML per ASTM D–2487 based on its Atterber Limits test results." *Id.*

The Drahos report, however, only shows that Xtra Fill was one of several suitable fill materials for the Project. According to the report, the Project could have used any material with the requisite profile and characteristics. Although the engineer did recommend Xtra Fill, that recommendation does not negate the fact that any number of fill materials could have been used. In fact, out of the long list of material classifications, Xtra Fill only classifies as SM or ML under ASTM D–2487. According to the Drahos report, the Project could have utilized a material classified as CL under ASTM D–2487, GC under ASTM D–2487, or several other classifica-

---

**9.** Thus, as between Rodgers and ReUse the fact of Williams' role is not disputed, notwithstanding that Williams takes a contrary view of its role.

**10.** *See* Mem. in Support of Rodgers's Mot. for Summary Judg. against Williams, undisputed fact no. 12.

tions. The Drahos report, therefore, does not support Rodgers' contention that Xtra Fill was not interchangeable with other fills. Indeed, the Drahos report establishes that the Project engineers selected Xtra Fill from among any number of possible interchangeable materials.

Moreover, Rodgers originally suggested that natural soil be used as fill material for the Project. In fact, the geotechnical engineer actually approved the use of natural soil for the Project.[11] This interrogatory illustrates, therefore, that Xtra Fill also is interchangeable with ordinary dirt.[12]

On this record, there is no triable issue of fact to support Rodgers' contention that Xtra Fill is not interchangeable with other materials. Stated conversely, there is no genuine dispute over whether Xtra Fill is a fungible material.

### (iii) Although ReUse Did Provide Instructions For The Installation Of Xtra Fill, These Instructions Were Not Specific To The Project

■ Finally, Rodgers argues that ReUse provided explicit instructions on the installation and handling of Xtra Fill. *See* Rodgers' Mem. in Opp. (setting forth portions of instructions provided by ReUse).[13] It argues that this fact illustrates that Xtra Fill is not an ordinary building material.

Although it is true that ReUse provided Rodgers with specific instructions respecting the proper installation of Xtra Fill, these instructions were generic guidelines. Rodgers does not assert that ReUse pre-

pared these instructions specifically for the Project; and there is no evidence that the instructions that accompanied the sale of Xtra Fill were specific to the Project. Thus, Rodgers has not raised a triable issue of fact to support its assertion that the instructions provided by ReUse served to render Xtra Fill equipment or machinery as opposed to ordinary building materials. *Compare with Luebbers,* 498 S.E.2d at 913 (noting that instructions at issue were "general guides for the construction of generic vinyl pools .... these manuals did not address the construction of a pool with the particular dimensions and shape of the one involved in the present case," and finding that materials supplied by defendant were "ordinary building materials").

Considering the record as a whole in perspective of the test defined by the controlling decisional law, it is clear that Rodgers has not raised a triable issue of fact in support of its contention that Xtra Fill is not an ordinary building material. For the foregoing reasons, as a matter of law, Xtra Fill constitutes an ordinary building material and, therefore, the liability of its supplier, ReUse, is governed by the provisions of § 8.01–250.

### B. The Relevant Start Date For The Statute Of Repose

In *School Bd. of Norfolk v. U.S. Gypsum Co.,* 234 Va. 32, 360 S.E.2d 325 (1987), the Supreme Court of Virginia explained that although the terms "statute of repose" and "statute of limitations" are often

---

**11.** *See* Rodgers' Answers to ReUse's Interrog. No. 3, appended as Exhibit A to Reply Mem. of ReUse in Support of Mot. for Partial Summary Judg.

**12.** The specific soil originally intended for use as a fill material was rejected as unsuitable because of a high moisture content. But, the

use of soil in general as a possible fill never was rejected.

**13.** Whether a manufacturer of a product included explicit instructions on how a buyer should install that product is, at bottom, a reformulation of the "control" factor outlined above.

"loosely employed as interchangeable, they are, in fact, different in concept, definition and function." *School Bd. of Norfolk,* 360 S.E.2d at 327. With a general statute of limitations, the time limitation ordinarily begins to run when the party suffers some injury. In contrast, the time limitation in a statute of repose begins to run from an event unrelated to the suffering of an injury. *Id.* ReUse and Rodgers agree with these guiding precepts. They disagree sharply, however, about what "event" constitutes the starting point for the five-year period.

ReUse argues that the statute of repose began to run in July 1997 when ReUse delivered its last shipment of Xtra Fill to Rodgers for use at the Project. Under this theory, Rodgers' tort-based indemnity claims would be barred by the statute of repose after July 2002.

Rodgers posits two alternative arguments in response. First, Rodgers asserts that, even if the statute of repose applies to this case, the statute did not begin to run until the Project was completed in its entirety. Rodgers also asserts that the date of final completion is a disputed fact, relying for that point on a document that suggests that the buildings on the Project were not completed until the summer of 1998. *See* Exhibit 9, appended to Rodgers's Mem. in Opp.

Alternatively, Rodgers asserts that a logical start date for the running of the five-year period of repose is the date that the Xtra Fill was completely installed at the Project. Rodgers points to several items of evidence to support its contention that installation of the Xtra Fill was not complete until April 1998. *See* Exhibits 9,

11, 12, and 13, appended to Rodgers's Mem. in Opp.

### (i) The Five–Year Period Outlined In § 8.01–250 Does Not Always Commence Upon Completion Of An Entire Construction Project

Rodgers' argument that the five-year period did not begin to run until completion of the entire Project is based on the decision in *Federal Reserve Bank of Richmond v. Wright,* 392 F.Supp. 1126 (E.D.Va.1975), wherein the court held that "a reasonable construction of the [the statutory precursor to § 8.01–250] would suggest a single limitations period to run from the final date of completion of the entire project." *Wright,* 392 F.Supp. at 1129.[14] In *Wright,* the architect who had designed the building and supervised its construction was sued for negligent design and negligent supervision of construction. The court was asked to find whether there should be a separate starting date for the commencement of the statute of repose for each claim: the date on which the architect completed the design for the negligent design claim and the date on which the architect completed supervision of construction for the negligent supervision of construction claim. The court rejected that position and, instead, held that there was but one starting date for purposes of the statute of repose—the end of the entire project.

Subsequent decisions have followed *Wright* and have held consistently that the five-year time period set forth in § 8.01–250 begins to run at the completion of the entire project. *E.g., Comptroller of Va. ex rel. Va. Military Inst. v. King,* 217 Va. 751, 232 S.E.2d 895 (1977); *McDonald v.*

**14.** In *Wright,* the court construed Virginia Code § 8–24.2, the statutory precursor to § 8.01–250. As noted in footnote 6 *supra,* however, the two statutes contain virtually identical language and all courts apply the case law construing § 8–24.2 when dealing with issues arising under § 8.01–250.

*Windermere Constr.*, No. 146632, 1996 WL 1065648 (Va. Cir. Ct. Dec.2, 1996). However, *Wright* and its progeny all involved actions against general contractors, supervising architects, or other individuals or entities that were involved in the entire project. Thus, although it now is settled that, insofar as general contractors and similarly situated entities are concerned, the statute of repose begins to run on the date that the entire project is complete, the decisional law does not clearly decide when the statute of repose begins to run against entities who are not general contractors or similarly situated entities.

In this action, Williams was the general contractor. Williams subcontracted with Rodgers to perform the earth-moving services; Rodgers then purchased Xtra Fill from ReUse. Thus, this action is not controlled by the decisions holding that as to a general contractor, or like entities with project-long responsibilities, the statute of repose begins to run on the date of final completion of a project. ReUse, unlike the defendants in *Wright* and its progeny, was not involved with the entire Project. Rather, ReUse's involvement with the Project was quite limited. ReUse's sole involvement with the Project was its providing of fill material for the construction site. Indeed, the undisputed record is that ReUse was a seller of a product that Rodgers subsequently installed in the project.[15]

There is little authority discussing when the five-year time period set forth in § 8.01–250 begins to run against subcontractors or other entities not involved with the entire project.[16] The plain text of § 8.01–250, however, supports the position taken by ReUse that the five-year period began to run before the date on which the Project was finally completed. The statute provides that "[n]o action ... shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property more than five years after the performance or furnishing of such services and construction." Va.Code Ann. § 8.01–250. Under the statutory text, the relevant start date for the five-year period, therefore, is the date of "performance or furnishing" of a service or construction by the one who performs or furnishes the service or construction, not the date of final completion of the entire project. Of course, if one is a general contractor or supervising architect, one would cease "perform[ing] or furnishing" the service or construction when one completes the entire project. In contrast, a mere supplier of materials or a subcontractor ceases "perform[ing] or furnishing" when it furnishes material or completes it portion of the work. In other words, a party in ReUse's position ceases to "perform[ ] or furnish[ ]" long before someone else (*e.g.*, the general contractor) completes the entire project.[17]

---

**15.** There is some dispute whether Williams directed the work of Rodgers and whether Rodgers purchased Xtra Fill at the direction of Williams. Those disputes do not affect the issue here under consideration.

**16.** Because the Supreme Court of Virginia has not spoken on this precise question, a federal court must predict what that court would do if presented with the issue. "When confronted with uncertain state law, a federal court, sitting in diversity jurisdiction, must predict what course the highest court in the

state would take." *Byelick v. Vivadelli*, 79 F.Supp.2d 610, 623 (E.D.Va.1999). The court can base this prediction on "canons of construction ... recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir.1999).

**17.** Clearly, ReUse did not perform or furnish the "design, planning, surveying, supervision of construction or construction" on the Project and thus would seem to fall outside the

Rodgers, nonetheless, argues that *Wright* and its progeny establish a blanket rule that the five-year period in § 8.01–250 always begins to run at the date of final completion. Application of the *Wright* holding to the facts here presented, however, would be an unwarranted extension of that decision and would run contrary to the plain text of the statute. *Wright* and its progeny correctly apply the statutory language of § 8.01–250 to the specific situation of general contractors and those parties in comparable situations. As noted above, a general contractor does not cease to "perform[ ] or furnish[ ]" until it completes the entire project. To hold, however, that the final completion date is the relevant start date for subcontractors and other suppliers not involved with the entire project would be to ignore the statute's language that the five-year period begins to run from the "performance or furnishing" of goods and services by the one who performs or furnishes them. At bottom, ReUse's "performance and furnishing" was limited to the furnishing of Xtra Fill. Thus, unlike the defendants in *Wright* and its progeny, it had no involvement with other aspects of the construction project.

This result is consonant with the purpose of the statute, for as the Supreme Court of Virginia has explained:

> Construction projects can be expected to last for many years after their completion. The owner or occupier of the project will be exposed to long-term liability because he will remain responsible for the maintenance of the project. With the abolition of lack of privity as a defense ... building contractors may be subject to liability. However, absent a statute of repose ... [a] building con-

tractor also would be exposed to long-term liability, *even though their work had long since been completed....* There comes a time when [a defendant] ought to be secure in his reasonable expectations that the slate has been wiped clean of ancient obligations, and he ought not to be called on to resist a claim when evidence has been lost, memories have faded, and witnesses have disappeared.

*Hess v. Snyder Hunt Corp.*, 240 Va. 49, 392 S.E.2d 817, 820 (1990) (emphasis added, internal citations and quotations omitted). To hold that the § 8.01–250 clock did not begin to run on ReUse's work until completion of the entire project would run counter to achievement of the statutory purpose as defined by the Supreme Court of Virginia.

For the foregoing reasons, the Court declines Rodgers' invitation to apply *Wright* and its progeny to the facts established on this record. Finding under the circumstances here presented that the statute of repose starts to run for a supplier of materials at the completion of the entire project is consistent neither with the text of the statute nor its purpose. Nor is such a result required by *Wright*.

**(ii) The Relevant Start Date Is The Date That ReUse Delivered The Xtra Fill**

It is thus necessary to ascertain the proper starting point for the commencement of the five-year period of repose for a supplier of a product that is later installed by others. Giving the statutory text its plain and usual meaning, and according the statute the construction required by Virginia's highest court, the statute of repose began to run when ReUse last deliv-

---

statute's protection. The Supreme Court of Virginia, however, has construed § 8.01–250 to include mere suppliers of ordinary building

materials. *Cape Henry Towers, Inc. v. Nat'l Gypsum Co.*, 229 Va. 596, 331 S.E.2d 476, 478 (1985).

ered Xtra Fill to the project, thereby performing the only act that could render it liable for an ordinary, fungible building material that was installed at the Project by, and under the direction of, others. That result obtains because it is undisputed that ReUse made its last delivery of Xtra Fill to the Project job site in July 1997. It is also undisputed that Rodgers did not commence its action against ReUse until more than five years thereafter. Hence, ReUse is entitled to summary judgment on the negligence claims asserted by Rodgers.

### (iii) Even If Rodgers' Alternative Commencement Date Is Used As The Starting Point For The Statute Of Repose, ReUse Is Entitled To Summary Judgment

As an alternative to its argument that the statute of repose did not commence until completion of the entire Project, Rodgers asserts that the five-year period did not commence until the Xtra Fill was completely installed at the Project. Even if that contention presents the correct construction of § 8.01–250, it would be of no use to Rodgers here because the record does not present a triable issue on the factual premise that underpins the alternative argument.

In support of its argument that the Xtra Fill was not installed completely until April 1998, Rodgers relies on several exhibits to its memorandum in opposition to ReUse's motions. Specifically, Rodgers contends that Exhibits 9, 11, 12, and 13 support its assertion that, as a matter of fact, the Xtra Fill was not installed until April 1998. These exhibits, however, are, at best, insufficient to raise a triable issue of fact in support of Rodgers' argument and are, at worst, actually indicative of the proposition that the Xtra Fill was installed well before April 1998.

Rodgers' Exhibit 9 is a final certification letter from Zannino Engineering, Inc. ("Zannino") dated July 22, 1998. Zannino, the structural engineer for portions of the Project, wrote this letter to inform the Project's manager that Zannino had completed its testing and inspection of the site. Rodgers contends that the date of this letter tends to show that the Xtra Fill was not installed in the Project until the spring of 1998. This document, however, actually establishes that both the Target and Ukrop's buildings were "under roof" by late in the summer of 1997. Obviously, a builder must install the fill material before constructing the buildings on top of it. Thus, Exhibit 9, rather than supporting Rodgers's contentions, actually undermines them.

Rodgers' Exhibit 11 is a document report prepared by Zannino. It states that Zannino performed several "soil borings" at the Kohl's site in April 1998 to obtain samples of the Xtra Fill. If, however, Zannino needed to perform "soil borings" in April 1998 to obtain samples of the fill material, the material obviously was installed in the ground at that time. Thus, Exhibit 11 merely illustrates that the Xtra Fill was installed in April 1998; it does not tend to show that the fill was not finally installed until that date. Exhibit 11, therefore, avails Rodgers nothing. Rodgers' Exhibit 12 is merely a letter concerning the tests set forth in the report contained at Exhibit 11. In other words, Exhibit 12 merely relays the information contained in the Zannino document contained at Exhibit 11. Exhibit 12, therefore, in no way assists Rodgers' position.

Rodgers' Exhibit 13 suffers from similar shortcomings. Like Exhibit 11, Exhibit 13 is a report prepared by Zannino. This report also indicates that Zannino conducted soil tests in late April 1998. The report, however, also indicates that, as of late April 1998, the construction had al-

ready commenced on several walls of the Kohl's store. If the builders had commenced construction of the walls of the store in April 1998, it is virtually certain that the fill material was completely installed by that date. Thus, as is true with Exhibit 11, the report contained in Exhibit 13 merely illustrates that the Xtra Fill had been installed before April 1998; it does not show that the fill was not installed until that date.

At bottom, it takes more than just an unclear record to raise the factual issue of when the installation of the material was complete. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Moreover, Rodgers' evidence illustrates that at least two of the buildings were under roof by late in the summer of 1997—a fact that significantly undermines Rodgers' contention that the Xtra Fill was not completely installed until April 1998. Even, therefore, if the Court were to accept Rodgers' argument that the statute of repose began to run on the date that the Xtra Fill was installed at the Project, Rodgers has raised no triable issue of fact to show that this event occurred within the five-year period before it filed its complaints against ReUse.

Thus, because Xtra Fill is an ordinary building material within the meaning of § 8.01–250, and, because under any reasonable construction of § 8.01–250 Rodgers did not commence this action within the five-year period, ReUse is entitled to summary judgment on Rodgers' negligence-based indemnity claims.

## II. The UCC Statute Of Limitations Respecting Rodgers' Warranty–Based Indemnity Claims

■ ReUse argues that, because Rodgers commenced its action against it more than four years after delivery of the last sale of Xtra Fill to Rodgers, the indemnity claims asserted by Rodgers (several of which, as presented by the parties seeking indemnity, sound in warranty) are barred by the Virginia UCC's statute of limitations applicable to warranty claims.[18] Va. Code Ann. § 8.2–725.

Virginia's statute of limitations for the sale of goods states in relevant part:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.

.    .    .    .    .

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made.

Va.Code. Ann. § 8.2–725.

Pointing to Rodgers' response to ReUse's request for admission number 13, ReUse states that it is an undisputed fact that its last delivery of Xtra Fill to Rodgers for use on the Project was in July 1997. It is not disputed that Rodgers' indemnity claims against ReUse were commenced in the fall and winter of 2002, more than four years after July 1997. Hence, ReUse asserts that, because Rodgers' indemnity claims originated as breach of warranty claims, the indemnity claims are time-barred by the statute of limitations contained in the UCC. *See* Va.Code. Ann. § 8.2–725.

Rodgers contends that § 8.2–725 simply does not apply here because its claim against ReUse is for indemnification and

---

18. When sitting in diversity and applying the substantive law of Virginia, the statute of limitations of Virginia are controlling. *See Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 112, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works*, 722 F.2d 1160, 1161 n. 1 (4th Cir.1983).

that, therefore, the relevant statute of limitations is Virginia Code § 8.01–249(5), not the statute of limitations contained in the UCC. In pertinent part, § 8.01–249.5 provides that:

> The cause of action in the actions herein listed shall be deemed to accrue as follows:
>
> .    .    .    .    .
>
> In actions for contribution or indemnification, when the contributee or the indemnitee has paid or discharged the obligation. A third-party claim permitted by subsection A of § 8.01–281 and the Rules of Court may be asserted before such cause of action is deemed to accrue hereunder.

Va.Code Ann. § 8.01–249(5). Because its underlying claim is for property damage, Rodgers asserts that a five-year statute of limitations applies, *see* Va.Code Ann. § 8.01–243, and that a proper application of § 8.01–249(5) mandates that this five-year period begins to run on the date that it pays or discharges its obligation to the third parties (*i.e.*, Williams, Kohl's, Target, etc.).[19]

■ The Supreme Court of Virginia has not decided directly whether the claim of a thirty-party plaintiff who impleads a third party for indemnification based on a warranty theory is time-barred because § 8.2–725 would bar a direct action by that third-party plaintiff against that third-party defendant. Thus, it is necessary to "predict what course the highest court in the state would take," *Byelick*, 79 F.Supp.2d at 623, using as guideposts "canons of construction ... recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Wells*, 186 F.3d at 528. The proper analysis here leads to the prediction that the Supreme Court of Virginia would hold that UCC § 8.2–725 would not apply to bar Rodgers' claims for indemnification.

■ At common law, it was well-settled that an action for indemnification did not accrue until the plaintiff suffered an injury, *i.e.*, until the plaintiff paid out money to a third party. *See Nationwide Mut. Ins. Co. v. Jewel Tea Co.*, 202 Va. 527, 118 S.E.2d 646, 649 (1961). The General Assembly codified this common law rule when it enacted § 8.01–249(5).[20] ReUse seeks to escape the necessary consequences of § 8.01–249(5) by arguing that, because it was more recently enacted, the UCC controls this issue.[21]

---

**19.** Rodgers also posits a separate theory in opposition to ReUse's motion for partial summary judgment. It argues that, if its action against ReUse was for direct property damages to Rodgers—in other words, if it were not an action for indemnification—the Virginia code would not bar the suit. This argument is not relevant because Rodgers' claim is not a direct action by Rodgers for damage to its own property. And, in any event, there is no need to address this alternate theory because ReUse's motion for partial summary judgment is denied based on the arguments that Rodgers asserts in its first, and primary, argument.

**20.** In *Jewel Tea Co.*, the Supreme Court of Virginia held that a cause of action for indemnification or contribution does not accrue until the plaintiff actually has paid out money to

a third party. When the General Assembly codified this common law rule, it legislatively tweaked the holding in *Jewel Tea Co.* Section 8.01–281 states that a claim based on future potential liability in contribution or indemnification may be asserted in a third-party motion for judgment filed in a pending action even though the third-party claimant has not yet made any payment or otherwise discharged any claim against him. *See* Va.Code Ann. § 8.01–281; *Gemco–Ware, Inc. v. Rongene Mold & Plastics Corp.*, 234 Va. 54, 360 S.E.2d 342, 344 (1987). Consequently, Rodgers can bring a suit for potential future liability now, even before it actually suffers any injury. *See also* Fed.R.Civ.P. 14.

**21.** ReUse also relies on the common law maxim of statutory interpretation that "when one statute speaks to a subject in a general way

There is a split of authority respecting the interplay between a UCC statute of limitations and the common law (and often statutory) rule that a cause of action for indemnification sounding in warranty does not arise until the indemnitee has paid the obligation. *See generally* Comment, Paul J. Wilkinson, *An Ind. Run Around the U.C.C.: The Use (or Abuse?) of Indemnity,* 20 Pepp. L.Rev. 1407 (1993) (summarizing split of authority). ReUse concedes that the authority in a slight majority of states is inconsistent with its position but it argues that, if presented directly with the issue, the Supreme Court of Virginia would hold that the UCC statute of limitations prevails over § 8.01–249(5) and thus bars Rodgers' claim.

To begin, it is quite clear that, if Rodgers, on its own behalf, had sued ReUse directly for breach of warranty, UCC § 8.2–725 would have applied. Thus, a direct claim for breach of warranty would be barred unless initiated within four years of delivery of the product sold by ReUse. *See* Va.Code § 8.2–725.

However, the Supreme Court of Virginia has held that a third-party plaintiff may maintain a claim in indemnification based on a warranty theory against a third-party defendant where § 8.2–725 would prevent the original plaintiff from suing the third party directly. In *Gemco–Ware, Inc. v. Rongene Mold & Plastics Corp.,* 234 Va. 54, 360 S.E.2d 342 (1987), a consumer suffered burns when the handle of a teakettle separated from the kettle causing boiling water to spill on her leg. The consumer filed an action against Gemco–Ware, Inc. ("Gemco"), the manufacturer of the kettle, but not against Rongene Mold and Plastics Co. ("Rongene"), which had manufactured the handle. Gemco later filed a third-party motion for judgment seeking contribution and indemnity against Rongene. In response, Rongene filed a demurrer asserting that, because the statute of limitations had expired as to any cause of action that the consumer may have had against Rongene, Gemco could not maintain an action in indemnity or contribution arising from the same suit. *Gemco–Ware, Inc.,* 360 S.E.2d at 343. The Supreme Court of Virginia rejected Rongene's argument and held that Gemco's claim for contribution and indemnification against Rongene was not time-barred even though the statute of limitations had run on the consumer's claim against Rongene. *Id.* at 345.

The precise issue presented here, however, is slightly different than that presented in *Gemco–Ware, Inc.* The issue in this action is whether Rodgers can sue ReUse for indemnification based on warranty theories even though § 8.2–725 would bar a direct claim for breach of warranty by Rodgers against ReUse. Thus, although the decision in *Gemco–Ware, Inc.* holds that a third-party claimant may maintain an indemnity claim sounding in warranty against a third party in a situation where § 8.2–725 would prevent the original plaintiff from suing the third party, the Supreme Court of Virginia has not decided whether a third-party plaintiff who impleads a third party for

and another deals with a part of the same subject in a more specific manner ... where they conflict, the latter prevails." *Halifax Corp. v. First Union Nat'l Bank,* 262 Va. 91, 546 S.E.2d 696, 703 (2001). ReUse asserts that the UCC provision is the more specific provision, thus, it should control the more general provision of § 8.01–249(5). ReUse also sets forth policy rationale in support of its position. However, although it has not decided a case directly on point, the Supreme Court of Virginia has indicated that the common law and statutory rule that an action in indemnity accrues at the point that the plaintiff pays a third party survives the adoption of the UCC. Therefore, it is not necessary to weigh conflicting policy rationales or apply rules of statutory construction.

indemnification based on a warranty theory is time-barred because § 8.2–725 would bar a direct suit by the third-party plaintiff against that third party.

Nonetheless, this action and *Gemco–Ware, Inc.* share a common underlying circumstance. Both cases involve a party with an underlying claim that would be time-barred under UCC § 8.2–725. And, there is no reason to believe that the Supreme Court of Virginia would not apply in this action the crux of its decision in *Gemco–Ware, Inc.* that the statute of limitations for indemnification and contribution begins to run upon payment and is not controlled by the statute of limitations applicable to the underlying warranty theory. The right of action to recover indemnification "arises upon discharge of the common obligation and the statute of limitations begins to run at that time." *Gemco–Ware, Inc.*, 360 S.E.2d at 345. In other words, the rationale upon which *Gemco–Ware, Inc.* was decided discloses no reason for not applying the same principles here, notwithstanding the factual difference between this action and *Gemco–Ware, Inc.*

Moreover, in *Gemco–Ware, Inc.*, the Supreme Court of Virginia approved a federal district court's resolution of the precise issue presented in this case. In *In re Fela Asbestos Litigation*, 638 F.Supp. 107 (W.D.Va.1986), *rev'd on other grounds sub. nom., Wingo v. Celotex Corp.*, 834 F.2d 375 (4th Cir.1987), employees of the Norfolk and Western Railway Company ("N & W") instituted an action against N & W for injuries allegedly caused by work-place exposure to asbestos. N & W, in turn, implead the various manufacturers of the asbestos (the "Manufacturers") for indemnification. The Manufacturers moved to dismiss this claim as time-barred under UCC § 8.2–725 because they had delivered the asbestos products to N & W more than four years before the commencement of the action against them. The district court, however, rejected this motion, holding that the cause of action for an indemnity claim accrues when the indemnitee is injured, not on the date of delivery of the product even when the underlying claim sounds in warranty and thus would seem to implicate the UCC. *In re Fela Asbestos Litigation*, 638 F.Supp. at 113 (holding that the point of accrual is "better linked to a time at which the indemnitee is injured, not the time at which the original plaintiff was injured.").

The Supreme Court of Virginia in *Gemco–Ware, Inc.*, explicitly commented that the district court in *In re Fela Asbestos Litigation* had reached the correct result. *Gemco–Ware, Inc.*, 360 S.E.2d at 344 ("One federal district court sitting in Virginia has correctly construed the effect of these procedural measures, [*In re Fela Asbestos Litigation*], while another has erroneously interpreted their effect," *Rambone v. Critzer*, 548 F.Supp. 660, 662 n. 1 (W.D.Va.1982).). Thus, although the decision in *Gemco–Ware, Inc.* is not directly on point because it involved a slightly different factual situation, the fact that *Gemco–Ware, Inc.* is conceptually almost identical to the present case and the fact that, in *Gemco–Ware, Inc.*, Virginia's highest court explicitly noted that the decision in *In re Fela Asbestos Litigation* was a correct approach to the issue here presented, it is safe to predict that the Supreme Court of Virginia would hold that Rodgers' indemnity claims based on warranty theories are not subject to the time bar imposed by § 8.2–725. *See also Walker Mfg. Co. v. Dickerson, Inc.*, 619 F.2d 305, 310 (4th Cir.1980) (construing North Carolina's UCC statute of limitations, which is virtually identical to Virginia UCC § 8.2–725, and stating that: "The U.C.C. was not intended to shield manufacturers of defective products from indemnity claims made by their purchasers more than four years

from the date of sale by their manufacturer").

▪ Finally, the result here is supported by the fact that Virginia law maintains a sharp distinction between a "right of action" and a "cause of action." *See, e.g., Gemco–Ware, Inc.,* 360 S.E.2d at 344; *Caudill v. Wise Rambler, Inc.,* 210 Va. 11, 168 S.E.2d 257, 259 (1969). A right of action is a specific right of a specific person to enforce presently a remedial right. On the other hand, a cause of action is an inchoate right; it is a set of facts which may give rise to a right of action. A cause of action must exist before a right of action can accrue. *Gemco–Ware, Inc.,* 360 S.E.2d at 343–44. "While a cause of action and a right of action may accrue simultaneously, they do not necessarily do so." *Id.* at 344 (citations and quotations omitted). In the cases of contribution and indemnification, the cause of action and the right of action do not arise at the same time. *Id.* The accrual of the inchoate cause of action for indemnification arises at the time the underlying wrongful act is committed; the right of action for indemnification, however, does not arise until the party pays money to a third party to discharge an obligation caused by this wrongful act. *Id.*

Thus, in this action, the cause of action for indemnification accrued at the point ReUse delivered the allegedly faulty Xtra Fill to the Project. The right of action for indemnification, however, will not accrue until Rodgers fulfils its monetary obligations to the underlying plaintiffs (Kohl's, CCSC, etc.).[22] Although Rodgers had an inchoate cause of action at the point ReUse delivered the allegedly faulty Xtra Fill, this cause of action did not develop into a full right of action until Rodgers became potentially liable—*i.e.,* when the various parties sued it. Moreover, it was not until this point that the statute of limitations began to run. *Jewel Tea Co.,* 118 S.E.2d at 649; *Winckel v. Carter,* 198 Va. 550, 95 S.E.2d 148, 152 (1956). This distinction between causes and rights of action further indicates that, if presented with the ReUse motion here at-issue, the Supreme Court of Virginia would deny it.[23]

## CONCLUSION

For the foregoing reasons, ReUse's motion for partial summary judgment on Rodgers' tort-based indemnity claims are GRANTED and the motion for partial summary judgment on Rodgers' indemnity claims sounding in warranty are DENIED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

22. Fed R. Civ. P. 14 gives Rodgers a right to litigate now its claim for potential future liability. *See supra,* note 20.

23. ReUse also vaguely contends that, because indemnity is borne of equity and because Rodgers has known about problems with Xtra Fill at the Project site for some time but has not asserted an indemnity right, the Court should find that Rodgers has engaged in inequitable conduct that bars the assertion of the indemnity claim now. Whatever this contention may be about, it is without merit. For all the reasons set forth in the preceding text, Rodgers cannot be found to have slumbered on its rights by failing to prosecute an indemnity claim before it was called upon by others to answer for ReUse's conduct.